# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DANIEL RENTERIA-VILLEGAS; DAVID GUTIERREZ-TURCIOS; ROSA LANDAVERDE, | ) ) ) | Case No. 3:11-cv-218 |
| Plaintiffs, | ) ) | Senior Judge John T. Nixon |
| v. | ) ) | Magistrate Judge Joe Brown |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) ) ) ) ) | |
| Defendants. | ) | |

## THIRD AMENDED COMPLAINT

Come now Plaintiffs Daniel Renteria-Villegas ("Renteria"), David Ernesto Gutierrez-Turcios ("Gutierrez"), and Rosa Landaverde ("Landaverde"), by and through their undersigned counsel, and hereby file this Third Amended Complaint against Defendant Metropolitan Government of Nashville and Davidson County ("Metro Government") and Defendant United States Immigration and Customs Enforcement Agency ("ICE").

## PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief and damages. Plaintiffs seek a declaration of their rights and a construction of the validity under the Metropolitan Charter of Nashville and Davidson County ("Metro Charter") of a 2009 Memorandum of Agreement between the Metro Government and ICE, as well as the Metro Council Resolution approving the Agreement. *See* Certified Copy of Metro Charter §§ 16.05 and 8.202, attached as Exhibit 1. *See also* Memorandum of Agreement ("287(g) Agreement"), attached as Exh. 2. S*ee also* Copy of Metro Council Resolution 2009-997, attached as Exh. 3. Because the 287(g) Agreement empowers Davidson County Sheriff's Office ("DCSO") deputies to perform law enforcement

Case 3:11-cv-00218   Document 30-1   Filed 04/19/11   Page 1 of 28 PageID #: 832

functions that are prohibited by mandatory language in the Metro Charter, the Metro Council Resolution approving the Agreement was *ultra vires*, the Agreement itself is *void ab initio*, and performance of the Agreement violates 8 U.S.C. §§ 1357(a) and 1357(g)(1), 8 C.F.R. § 287, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

2.      This action was originally filed in the Chancery Court for Davidson County, Tennessee on January 7, 2011. The Chancery Court had jurisdiction pursuant to Tenn. Code. Ann. §§ 16-11-102 and 29-14-101 *et seq.*

3.      On March 9, 2011, Defendant ICE filed a Notice of Removal in this Court. (Doc. Entry No. 1). ICE asserted the jurisdiction of this Court based exclusively on 28 U.S.C. § 1442(a)(1). Doc. Entry No. 1, ¶ 8.

4.      In addition, this Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 702 *et seq.* (waiving sovereign immunity for suits against the government for injunctive relief), 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental jurisdiction).

5.      Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts at issue in this lawsuit occurred within this District.

## PARTIES

6.      Plaintiff **Daniel Renteria-Villegas ("Renteria")** is a nineteen year-old natural born citizen of the United States. At all times relevant to this action, he has resided in Davidson County, Tennessee.

7.      Plaintiff **David Ernesto Gutierrez-Turcios ("Gutierrez")** is a twenty-three year-old Lawful Permanent Resident of the United States. He is a native and citizen of Honduras. At all times relevant to this action, he has resided in Davidson County, Tennessee.

2

8.     Plaintiff **Rosa Landaverde** has held Temporary Protected Status since 2001. She is a native and citizen of El Salvador At all times relevant to this action, she has resided in Davidson County, Tennessee.

9.     Defendant **Metropolitan Government of Nashville and Davidson County ("Metro Government")** is an incorporated, legal subdivision of the State of Tennessee. Metro Government is governed by a Mayor and a Metro Council, subject to the organic document enabling its creation – the Metro Charter – and the Tennessee Constitution and Tennessee Code Annotated.

10.     Defendant **United States Immigration and Customs Enforcement Agency ("ICE")** is an executive agency of the United States Department of Homeland Security. ICE is charged with enforcing federal immigration law consistent with the laws and Constitution of the United States. ICE first entered this action as a court-ordered indispensable party after Motion by the Metro Government. Order Granting Motion to Add The United States As An Indispensable Party And Granting Thirty Days To Amend Complaint, Case No. 11-32-II (Davidson County Chancery Ct. Feb. 28, 2010).

## FACTUAL ALLEGATIONS

### A.  The DCSO's Limited Powers Under the Metro Charter

11.     Since the institution of metropolitan government in 1963, the Davidson County Sheriff is no longer a law enforcement official. Currently, the Sheriff's Office is charged with two major functions: the safety and security of all inmates housed in Davidson County jails, and the service of all civil process. The Metropolitan Nashville Police Department functions as the primary law enforcement agency.

3

12.     Section 16.05 of the Metro Charter specifies that the Sheriff of Davidson County "shall have such duties as are prescribed by Tennessee Code Annotated 8-8-201, or by other provisions of general law; **except**, that within the area of the metropolitan government the sheriff shall not be the principal conservator of the peace. The function as principal conservator of the peace is hereby transferred and assigned to the metropolitan chief of police, provided for by article 8, chapter 2 of this Charter." (emphasis added)

13.     Article 8, chapter 2 of the Charter sets forth the "responsibility and powers" of the Metropolitan Police Department as follows: "the department of the metropolitan police shall be responsible within the area of the metropolitan government for the preservation of the public peace, prevention and detection of crime, apprehension of criminals, protection of personal property rights and enforcement of laws of the State of Tennessee and ordinances of the metropolitan government. The director and other members of the metropolitan police force **shall be vested** with all the power and authority belonging to the office of constable by the common law and also with all the power, authority and duties which by statute may now or hereafter be provided for police and law enforcement officers of counties and cities." (emphasis added)

14.     Section 2.01(36) of the Metro Charter specifies that "when any power is vested by this Charter in a specific officer, board, commission, or other agency, the same **shall be deemed to have exclusive jurisdiction within the particular field**." (emphasis added)

15.     The Tennessee Supreme Court has interpreted the text of Sections 16.05, 8.202, and 2.01(36) and determined that "Section 16.05 makes such an exclusive vestment in the Chief of Police."

16.     A senior ICE official responsible for supervising the DCSO 287(g) program has repeatedly acknowledged to an ICE Deputy Assistant Secretary that "the DCSO has no law

4

enforcement role outside the correctional program. The Nashville Metropolitan Police Department maintains all authority to conduct law enforcement functions, including arrests of violators."

### B. The 287(g) Agreement Empowers DCSO Deputies to Perform Law Enforcement Functions

17.     The Metro Government entered into its current 287(g) Agreement with ICE in October of 2009.

18.     By its terms, the Agreement delegates certain federal immigration law enforcement powers to qualified DCSO deputies called "Jail Enforcement Officers."

19.     The Agreement delegates to DCSO Jail Enforcement Officers:

    a.  "the power and authority to interrogate any person believed to be an alien as to his right to be in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1))";

    a.  the "power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2))";

    b.  the "power and authority to serve warrants of arrest for immigration violations pursuant to INA § 287(a) and 8 C.F.R. § 287.5(e)(3)[.]";

    c.  "the power and authority to prepare charging documents"; and

    a.  the "power and authority to issue immigration detainers (INA § 236, INA § 287, and 8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors[.]"

20.     The 287(g) Agreement states its express intent "to enable the DCSO to identify and process immigration violators and conduct criminal investigations under ICE supervision[.]"

21.     The 287(g) Agreement states its purpose as allowing the DCSO's collaboration with ICE "to enhance the safety and security of communities by focusing resources on identifying and proposing for removal criminal aliens who pose a threat to public safety or a danger to the community."

22.     Sheriff Daron Hall, speaking under oath, described his understanding of what DCSO 287(g) Jail Enforcement Officers do: "Well, the way I understand it, it's just like a Police Department . . . taking their charges to a district attorney, for example; here's what we believe happened, here are the facts surrounding this case; and then it's determined whether to pursue charges. Charges, in my analogy, is that the federal agent then takes the case to a federal judge. Very similar to that. We're doing the grunt work of the case and we're turning in what we have on the individual."

23.     In a subsequent deposition in which the Metro Government designated Sheriff Hall as the individual testifying on Metro's behalf pursuant to Fed. R. Civ. P. 30(b)(6), the Sheriff indicated that he would not alter this statement in any way.

**C.  ICE Trains DCSO Deputies To Perform Federal Law Enforcement Functions**

24.     The 287(g) Agreement and 8 U.S.C. § 1357(g) require ICE to train and certify DCSO personnel through the Immigration Authority Delegation Program.

25.     The ICE curriculum for the initial training of DCSO deputies to complete in order to obtain federal 287(g) designation lasts almost four weeks.

26.     Modules in the ICE 287(g) training DCSO deputies receive include: "ICE enforcement operations," "Officer civil liability and civil rights," "Victim/Witness Awareness," "Sources of Information," "A-File Review," "Activity Prep," "Nationality Law," "Statutory Authority," "Criminal Law," "False Claim to USC," "DOJ Guidance Regarding the Use of

Race," "Law Exam I," "Document Examination," "Immigration Law," "Law Exam II," "Alien Encounters," "Re-Entry After Removal," "I-213 Prep," "Removal Charges," "Consular Notification," "Alien Processing," and "Intel Overview."

27.     Through their training, DCSO 287(g) deputies are required to complete Classroom Exercises in which they must demonstrate knowledge of the federal immigration and criminal laws, and the sources of power and authority by which immigration officers enforce these laws.

28.     These training materials distinguish between "booking information" and other information DCSO 287(g) Jail Enforcement Officers may collect during their interrogations. The training manual states, "If the alien invokes his right to counsel, an immigration officer can only ask the alien about 'booking information' such as the alien's name, date of birth, sex, color of hair and eyes, height, weight, and U.S. address."

29.     Nationality and immigration status are not included within the list of "booking information" questions in ICE's training materials.

30.     As part of the "Criminal Law" portion of ICE's training curriculum, DCSO deputies were expected to be able to "1. Identify Federal criminal violations;" "2. Identify the elements of Federal criminal violations;" "3. Identify the elements of Federal administrative violations;" and "4. Identify the judicial process for criminal violations." This training module states, "Immigration officers . . . work extensively in both criminal and administrative law arenas and accordingly must always be aware and sensitive to the differences between the two. Many situations encountered in the field involve laws that provide for separate criminal and administrative sanctions. Many illegal actions relating to the enforcement of the immigration laws of the United States (U.S.) can be either criminally or administratively prosecuted."

### D. DCSO 287(g) Officers Perform Federal Law Enforcement Investigations

31.     When law enforcement officers make an arrest in Davidson County, they normally complete an arrest report indicating the arrestee's place of birth.

32.     Once the arrestee arrives at the DCSO for booking, DCSO deputies may inquire about the arrestee's nationality as part of the biographic information they collect during the booking process.

33.     If information obtained during arrest and booking indicates that an arrestee may be foreign-born, a DCSO booking deputy places a red stamp that reads, "ICE" on the arrestee's paperwork.

34.     That paperwork is then placed in a queue for further investigation by a DCSO Jail Enforcement Officer.

35.     Pursuant to the 287(g) contract, DCSO Jail Enforcement Officers may prepare and issue a federal immigration detainer, "Form I-247, Immigration Detainer – Notice of Action."

36.     The detainer – also called an "ICE Hold" – requests that the DCSO keep the inmate in custody for up to forty-eight additional hours (not including weekends and federal holidays) while ICE investigates his or her immigration status.

37.     For each inmate subject to an ICE hold, Form I-247 next indicates, "Investigation has been initiated to determine whether this person is subject to removal from the United States."

38.     Even if no I-247 has been lodged against an inmate, DCSO Jail Enforcement Officers consistently add a notation to an inmate's Jail Management System file if that inmate is subject to a 287(g) investigation.

39.    The federal investigation into an arrestee's immigration status occurs primarily through an interrogation by a DCSO 287(g) Jail Enforcement Officer.

40.    This federal investigation and the interrogation require DCSO Jail Enforcement Officers to apply their training and knowledge of federal immigration law to determine whether the subject of the interview has violated federal law.

41.    The questions DCSO Jail Enforcement Officers regularly ask during 287(g) interrogations include:

   a.   "When did you cross the border?" (a potential violation of 8 U.S.C. § 1325);

   b.   "Did you pay a smuggler?";

   c.   "How much?"; and

   d.   "Prior deports?" (a potential violation of 8 U.S.C. § 1326)

42.    Lying to a Jail Enforcement Officer during a 287(g) interrogation can subject the subject to criminal liability for lying to a federal agent.

43.    Upon completion of an investigation, DCSO ICE deputies recommend individuals for removal (deportation) and a federal ICE agent working in the CJC signs that recommendation if approved.

44.    If the federal ICE Supervisor approves the DCSO Jail Enforcement Officer's recommendation to place the inmate into immigration proceedings, the JEO typically prepares a "Removal Packet."

45.    A copy of this packet accompanies the arrestee as she is processed through federal detention centers and the immigration court system.

46.    The "Removal Packet Worksheet" contains a checklist of documents that should be included, along with areas for the JEO to initial next to each required form.

9

47.     These documents constitute the record DHS will use against the inmate in removal proceedings.

48.     Among them is Form I-213, Record of Deportable/Inadmissible Alien.

49.     The DCSO Jail Enforcement Officer prepares this record and presents it to the ICE Supervisor for review, approval, and signature.

50.     ICE training of DCSO deputies clarifies the critical role of the I-213 in removal proceedings: "The use of the I-213 creates a historical record of information which, since it is used as evidence in removal proceedings, must be complete and accurate. A properly completed I-213 then provides the basis for successful processing of the alien and stands as primary evidence of alienage and removability."

51.     DCSO Jail Enforcement Officers have been reminded by their ICE supervisor that, "the I-213 is the evidence that is submitted to the judge that the alien was properly interviewed."

52.     In addition to the I-213, DCSO 287(g) Jail Enforcement Officers are also authorized to prepare and sign Form I-877. The first full paragraph of text on the first page of Form I-877 reads: "I am an officer of the United States Immigration and Naturalization Service, authorized by law to administer oaths and take testimony in connection with the enforcement of the Immigration and Nationality laws of the United States. I desire to take your sworn statement regarding: Immigration status, criminal record and criminal conduct."

53.     Lying to a DCSO Jail Enforcement Officer after being placed under oath constitutes perjury under federal law.

54.     The second question on Form I-877 is "Do you wish to have a lawyer or any other person present to advise you?"

55.     The following nine pages of Form I-877 contain questions designed by ICE to elicit admissions of civil and criminal liability on a wide range of immigration-related topics.

56.     DCSO Jail Enforcement Officers also prepare, sign, and present to the subjects of their investigations other law enforcement documents, including the Notice to Appear in Immigration Court (a charging document), the Warrant for Arrest of Alien, and, when appropriate, a Notice of Intent/Determination to Reinstate a Prior Removal Order.

**E.  The DCSO's 287(g) Investigation and Unlawful Detention of Daniel Renteria**

57.     Metro Police Department Officer Rickey Bearden arrested Daniel Renteria at his home in Davidson County on Sunday, August 22, 2010, at or around 4:46 p.m.

58.     This arrest occurred pursuant to a criminal warrant that was subsequently dismissed for lack of probable cause.

59.     The Metro Police Officer who arrested Renteria completed an Arrest Report indicating Renteria's place of birth was "Mexico."

60.     DCSO employees booked Renteria into the DCSO's Criminal Justice Center facility between 5:00 p.m. and 8:00 p.m. on August 22.

61.     Among the belongings Renteria had in his possession at the time of booking was his state-issued Tennessee Identification Document (I.D.) card.

62.     A DCSO employee took this card and all Renteria's other belongings into the DCSO's possession during booking.

63.     When DCSO deputies booked Renteria into the Criminal Justice Center, they asked him where he was born.

64. Renteria truthfully responded that he was born in Portland, Oregon. The demographic information in Renteria's DCSO Jail Management System file states his P[lace] O[f] B[irth] as "OR[EGON]."

65. During the booking process a DCSO deputy or employee named "K. Cash" placed an ICE Hold on Renteria at approximately 5:57 p.m. on August 22.

66. DCSO deputy and designated 287(g) Jail Enforcement Officer Willie Sydnor updated Renteria's ICE Hold status to reflect that an active ICE investigation was underway at 7:57 p.m. on August 22.

67. Upon information and belief, a DCSO deputy placed a red stamp that reads "ICE" on Renteria's intake and booking paperwork and dropped that paperwork into a box for DCSO's 287(g) Jail Enforcement Officers to retrieve.

68. DCSO 287(g) Jail Enforcement Officers initiated a federal law enforcement investigation of Renteria to determine his immigration status, and also to determine whether he had violated federal criminal law by making a false claim to U.S. citizenship, being in possession of false identification documents, or using a stolen social security number.

69. At approximately 9:47 a.m. on August 24, 2010, DCSO deputy and designated 287(g) Jail Enforcement Officer Marty Patterson scheduled Renteria for an "ICE Interview", to occur between 10:30 a.m. and 11:00 a.m. the same day.

70. The purpose of the DCSO Jail Enforcement Officer's interrogation of Renteria was to elicit specific information related to possible violations of federal immigration and criminal law. *See* 8 C.F.R. § 287.5(a)(1).

71.     This 287(g) interrogation occurred in a small office within the DCSO's administrative area at the CJC between 12:26 p.m. and 1:09 p.m. on August 24. The sign above the door on this small office reads, "ICE OFFICE."

72.     Upon information and belief, a computer terminal inside this ICE office is equipped with ICE's IDENT/ENFORCE software and database.

73.     Upon information and belief, the IDENT/ENFORCE system is used by DCSO 287(g) Jail Enforcement Officers to collect and share with ICE and other law enforcement agencies investigative information DCSO deputies gather during 287(g) encounters with suspected foreign-born inmates.

74.     Upon information and belief, a DCSO 287(g) Jail Enforcement Officer utilized the IDENT/ENFORCE system and other computer technology during Daniel Renteria's interrogation on August 24, 2010.

75.     During this interrogation, a male DCSO 287(g) Jail Enforcement Officer told Renteria that he was suspected of having lied about being born in the United States.

76.     Making a false claim to U.S. citizenship is a violation of federal criminal law. *See* 18 U.S.C. § 911.

77.     The Jail Enforcement Officer asked Renteria the name of the hospital where he was born.

78.     Renteria truthfully answered that he was born at St. Vincent's Hospital.

79.     Renteria's answer, however, did not appear to allay the Jail Enforcement Officer's suspicions about Renteria's citizenship and immigration status.

80.     Improper entry into the United States by a non-U.S. citizen is a federal crime, as is illegal reentry. *See* 8 U.S.C. §§ 1325, 1326.

81.     The DCSO 287(g) Jail Enforcement Officer informed Renteria that the social security number he provided at booking did not match the one on a previous report.

82.     Using a false social security number is a federal crime. *See* 18 U.S.C. § 1028.

83.     When Renteria recited his social security number, the DCSO 287(g) Jail Enforcement Officer appeared to type that number on a computer keyboard.

84.     The DSCO 287(g) interrogator looked at a computer monitor after typing the numbers and then said to Renteria, "Oh, okay. That's right."

85.     This indicated to Renteria that his social security number had come back on a computer database as being valid, and as belonging to him.

86.     Upon information and belief, at this point in the interrogation and investigation, the DCSO Jail Enforcement Officer had objectively verified using a government or other database that Renteria possessed a valid social security number.

87.     In addition to questioning him about his social security number, the DCSO Jail Enforcement Officer questioned Renteria about the names of his family members, their places of birth, and their current places of residence.

88.     Renteria responded that both of his parents had been born in Mexico, and that some of his relatives currently live in Mexico. He also said that other relatives currently live in the United States.

89.     During the interrogation, Renteria saw his Tennessee state I.D. card paper-clipped to a file folder that the DCSO Jail Enforcement Officer used.

90.     The Jail Enforcement Officer took Renteria's I.D. card off the file folder, showed it to Renteria, and asked Renteria how he had obtained it.

14

91. Renteria told the officer he used his U.S. passport and social security card when he applied for his state I.D.

92. Tennessee law requires applicants to demonstrate proof of U.S. citizenship or other lawful immigration status as a pre-requisite for obtaining a valid, state-issued I.D. T.C.A. § 55-50-303(a)(9).

93. Using a false identification document is a federal crime. *See* 18 U.S.C. § 1028.

94. The DSCO Jail Enforcement Officer who conducted the 287(g) interrogation did not lift the ICE Investigative Hold when the interrogation ended.

95. Nor did the DCSO Jail Enforcement Officer tell Renteria what, if anything, he could do to prove his U.S. citizenship to the DCSO and get the ICE Hold removed.

96. At or around 12:52 p.m. on September 3, 2010 the DCSO became aware via the JMS that a Davidson County General Sessions Judge dismissed the charge for which Renteria was arrested on August 22, 2010.

97. At 9:56 p.m. on September 3, 2010, DCSO deputy or employee "W. Ford" deactivated Renteria's "ICE Investigative Hold" imposed by DCSO several days earlier.

98. "W. Ford" lifted the ICE Investigative Hold only after two of Renteria's relatives brought his original birth certificate and original passport to the CJC late in the evening on September 3, 2010.

99. A DCSO employee made a copy of these documents, returned the originals, and kept the copies.

100. Even after DCSO employees had original documents proving Renteria's U.S. citizenship and made photocopies of those documents at around 10:00 p.m. on September 3, it took almost three more hours for Defendants to release him.

101.     The DCSO released Renteria at 12:48 a.m. on September 4, 2010.

102.     The twelve hours Renteria spent in Defendant DCSO's custody after his charge was dismissed were a direct result of the DCSO's 287(g) Program and the ICE Investigative Hold placed on Renteria by DCSO Jail Enforcement Officers.

103.     However, no Jail Enforcement Officer or ICE agent ever lodged an I-247, Immigrant Detainer – Notice of Action against Renteria, as required by 8 C.F.R. § 287.7(d).

104.     Renteria is of Latino race, ethnicity, and appearance.

105.     He is a native Spanish-speaker of limited English proficiency.

106.     Constance Taite has previously stated that DCSO jail inmates who claim to be U.S. Citizens will be subjected to a 287(g) investigation if they speak "little English."

107.     Despite documentary proof that he is a natural born citizen of the United States, Renteria's name and documents were retained by DCSO Jail Enforcement Officer Marty Patterson.

108.     Patterson retained these documents for his own "personal file," and did not disclose the existence of this file in response to an Open Records Request made by Renteria's undersigned attorney.

109.     Patterson also seized Renteria's Tennessee Identification Document card during the 287(g) interrogation for the purposes of using it as evidence in the federal law enforcement investigation of Renteria.

110.     This I.D. card has not been returned, despite repeated requests by both Renteria and his undersigned attorney.

111.    Renteria's name and the names and immigration status information of his family members remain in at least one federal database as a result of the 287(g) investigation DCSO officers conducted.

112.    Renteria is suffering ongoing, actual harm as a result of the DCSO's illegal interrogation and investigation of him and his family.

**F.  The DCSO's Unlawful Investigation of David Gutierrez**

113.    An officer of the Metro Police Department arrested David Gutierrez following a traffic accident on April 12, 2010.

114.    He was booked into the DCSO's Criminal Justice Center facility shortly after being arrested.

115.    Upon information and belief, Gutierrez's booking records correctly indicated that he was not born in the United States.

116.    Upon information and belief, a DCSO Deputy placed on ICE Hold on Mr. Gutierrez on or about April 12, 2010.

117.    Upon information and belief, a DCSO deputy placed a red stamp that reads "ICE" on Gutierrez's intake and booking paperwork and dropped that paperwork into a box for DCSO's 287(g) Jail Enforcement Officers to retrieve.

118.    Upon information and belief, DCSO 287(g) Jail Enforcement Officers initiated a federal law enforcement investigation of Gutierrez to determine his immigration status, and also to determine whether he had any violated federal criminal laws.

119.    Soon after he entered DCSO custody, Gutierrez was interrogated in the DCSO 287(g) "ICE" Office by a DCSO 287(g) Jail Enforcement Officer.

120.     The Jail Enforcement Officer asked Gutierrez where he was born. Gutierrez replied that he was born in Honduras.

121.     The Jail Enforcement Officer then asked Gutierrez if he is a U.S. citizen or Permanent Resident of the United States, or if he had any other form of legal authorization to be and remain in the United States. Gutierrez indicated that he is a Lawful Permanent Resident of the United States.

122.     The Jail Enforcement Officer asked Gutierrez for his social security number. Gutierrez recited his social security number. The interrogator typed the numbers Gutierrez provided into the ICE computer terminal located inside the DCSO's "ICE Office."

123.     After reviewing the computer screen, the DCSO 287(g) Officer indicated to Gutierrez that he would not have any problems with immigration at this juncture in his case.

124.     Gutierrez's criminal defense attorney has reached a plea agreement that will require Gutierrez to serve several days in jail at a DSCO facility. Gutierrez will accept this plea agreement at an upcoming court hearing.

125.     Pursuant to the terms of the plea agreement, Gutierrez will be required to enter the DCSO jail facility in the immediate future. He will have two additional criminal convictions on his record when he enters the jail.

126.     Daron Hall is the Sheriff of Davidson County and chief policymaker for the DSCO. Sheriff Hall has stated under oath that it is DCSO's policy to subject every person who enters the Davidson County Jail system to a 287(g) investigation if they are or may be foreign-born. Upon information and belief, this was the DCSO's policy prior to and as of January 7, 2011 -- the date Plaintiff Renteria filed his Verified Complaint.

127.    David Gutierrez will re-enter the DCSO Jail system, and because he was not born in the United States, he will be subjected to the DCSO's 287(g) investigation.

128.    DCSO's stated policy requires the DCSO to lodge an ICE Hold against Gutierrez and conduct a law enforcement investigation into his right to remain in the United States in light of his two new criminal convictions.

129.    It was DCSO's policy as of January 7, 2010 to automatically classify inmates with ICE Holds as medium security inmates.

130.    A 287(g) investigation by DCSO Jail Enforcement Officers will adversely impact Gutierrez's liberty by (a) automatically subjecting him to medium security classification; (b) subjecting him to additional constraints and conditions on his release from DCSO custody; and (c) subjecting him to an additional 287(g) law enforcement investigation into his right to remain in the United States as a Lawful Permanent Resident.

**G.  Metro Government's Unlawful Expenditure of Plaintiffs' Municipal Tax Dollars On The Illegal 287(g) Agreement**

131.    Rosa Landaverde co-owns real property in Davidson County, Tennessee.

132.    She has paid municipal property taxes on that real property to the Metropolitan Government of Nashville and Davidson County.

133.    Ms. Landaverde has also paid municipal sales tax on purchases made within Davidson County.

134.    Her son is currently in removal proceedings after being processed by the DCSO 287(g) program.

135.    Plaintiffs Renteria and Gutierrez have also paid municipal sales tax on purchases made within Davidson County.

136.    The DCSO 287(g) program currently consists of eleven DCSO employees.

137. Pursuant to 8 U.S.C. § 1357(g)(1) and the 287(g) Agreement, all 287(g)-related duties performed by these 11 employees must be performed at the expense of the Metro Government.

138. The DCSO receives funding, in whole or in part, for the salaries of the 8 corrections officers, 2 supervisors, and 1 Director who administer the 287(g) program, from the Metro Government's "GSD General Fund 10101" account.

139. In Fiscal Year 2010-2011, approximately 52% of the Metro Government's tax revenues came from property taxes.

140. In Fiscal Year 2010-2011, approximately 17% of the Metro Government's tax revenues came from property taxes.

141. All Plaintiffs therefore have standing as municipal taxpayers for preliminary and permanent injunctive relief to prevent the continued misuse of their municipal tax dollars by the Metro Government on the illegal 287(g) program.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE METRO CHARTER
(Tenn. Code. §§ 29-14-102, 103, 111; 28 U.S.C. § 2201)
(All Plaintiffs against Defendant Metro Government)

142. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all paragraphs above.

143. All parties meet the definition of a "person" under T.C.A. § 29-14-101.

144. The Tennessee legislature has directed courts to liberally construe the declaratory judgment provisions of the Tennessee Code to settle disputes and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. T.C.A. § 29-14-113.

145.    Plaintiffs' legal rights have been adversely affected by Defendant Metro Government's actions under the 287(g) Agreement. T.C.A. § 29-14-103.

146.    A real and actual controversy exists between Plaintiffs and Defendant Metro Government concerning the legality of the 287(g) Agreement under the Metro Charter.

147.    Plaintiffs claim the DCSO's 287(g) law enforcement investigation and interrogation of them exceeds the Sheriff's powers under the Metro Charter, that the Metro Council violated mandatory provisions of the Metro Charter by approving the 287(g) Agreement, and that the Agreement is therefore void.

148.    Defendant Metro Government maintains the 287(g) Agreement is valid in all respects.

149.    A declaratory judgment as to the validity of the Agreement under the Metro Charter would resolve this controversy.

150.    Plaintiffs therefore seek a declaratory judgment declaring that the Metro Council acted *ultra vires* by approving the 287(g) Agreement, that the Agreement is void *ab initio*, and that the expenditure of municipal taxpayer funds on the Agreement's performance violates the Metro Charter and state law governing the Metro Government's use of taxpayer dollars.

151.    Plaintiffs also seek a preliminary and then a permanent injunction halting the performance of the 287(g) Agreement.

### COUNT II
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
(5 U.S.C. §§ 701 *et seq.*; 28 U.S.C. § 2201)
(Plaintiffs Renteria and Gutierrez against ICE)

152.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in all paragraphs above.

153.    ICE's approval of the 287(g) Memorandum of Agreement constitutes final agency action.

154.    There is no other adequate remedy in court for challenging this final agency action.

155.    8 U.S.C. § 1357(g)(1) explicitly provides that federal immigration law enforcement functions may be performed by state and local law enforcement officers only "to the extent consistent with State and local law."

156.    The DCSO's 287(g) program violates Sections 16.05, 8.202 and 2.01(36) of the Metro Charter and the Tennessee Supreme Court's holding in *Metropolitan Government of Nashville and Davidson County v. Poe*, which construes the Metro Charter as making an exclusive vestment of law enforcement power in the Metropolitan Police Department.

157.    Because the local party to the 287(g) Agreement cannot perform the Agreement's delegated federal law enforcement functions "consistent with State and local law," ICE's participation in and supervision of the DCSO's 287(g) Program is in excess of statutory authority and short of statutory right. 5 U.S.C. § 706(a)(2).

158.    Plaintiffs Renteria and Gutierrez are within the zone of interests Section 1357(g)(1) sought to protect, and their interests have been adversely affected by ICE and the DCSO's violation of this statute.

159.    No administrative remedies are available to Plaintiffs for obtaining review of the legality of the 287(g) Agreement under State and local law, and thus, no exhaustion was required. In the alternative, any exhaustion would have been futile.

160.    Once ICE entered into the 287(g) Agreement with the Metro Government, it had no discretion to allow a violation of 8 U.S.C. § 1357(g)(1).

161.     No statute precludes judicial review.

162.     Plaintiffs seek a declaratory judgment that their investigation by the DCSO pursuant to the 287(g) Agreement and ICE's supervision violated the APA and 8 U.S.C. § 1357(g).

**COUNT III**
**Violation of the Fourteenth Amendment Due Process Clause**
(42 U.S.C. § 1983, *Bivens*)
Plaintiff Renteria against the Metro Government and ICE

163.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in all paragraphs above.

164.     The following practices of Defendant Metro Government violated Plaintiffs' right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution:

    a.   Subjecting Renteria to custodial interrogation for the purpose of obtaining evidence of criminal violations without advising him of his right to counsel;

    b.   Imprisoning without probable cause after the release of his state charges, and without the issuance of a Form I-247 detainer;

    c.   Failing to give Renteria notice and an opportunity to be heard regarding the grounds for the DCSO detainer before imprisoning him pursuant to it; and

    d.   Seizing Renteria's Tennessee State I.D. card and never returning it.

165.     The imprisonment of Renteria on the basis of a false detainer without due process was carried out under the guise of the 287(g) authority delegated by ICE to DCSO Jail Enforcement Officers.

23

166. Upon information and belief, this imprisonment was the result of a DCSO custom, policy, and/or practice of deliberate indifference on the part of the DCSO and ICE supervisors charged with administering the 287(g) Agreement.

167. Plaintiff seeks compensatory damages against the Metro Government and a declaratory judgment against the Metro Government and ICE declaring that his right to due process was violated.

**COUNT IV**
**False Imprisonment**
**Plaintiff Renteria against Metro Government**

168. Plaintiffs hereby adopt and incorporate by reference the allegations contained in all paragraphs above.

169. The DCSO imprisoned Renteria for nearly twelve hours without any legal authority.

170. Plaintiff suffered severe emotional distress, humiliation, and psychological trauma as a result of his unlawful imprisonment by the DCSO.

171. Plaintiff therefore seeks compensatory and punitive damages against Defendant Metro Government and a declaratory judgment declaring that he was falsely imprisoned.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

(a)     Issue a Declaratory Judgment declaring:

    1.     The DCSO's 287(g) Agreement violates Sections 8.202, 16.05, and 2.01(36) of the Metro Charter, and the Tennessee Supreme Court's holding in *Metropolitan Government of Nashville and Davidson County v. Poe*, 383

S.W.2d 265, 275 (Tenn. 1964), by allowing the DCSO to interrogate inmates and take and consider evidence as part of a federal law enforcement function that is not necessary and incidental to the Sheriff's role as custodian of the jail and civil process-server, and that the Agreement is consequently invalid; and

2. Defendant Metro Government acted *ultra vires* by approving and implementing a contract that violates the mandatory provisions of the Metro Charter, and the contract is consequently void *ab initio*;

3. Defendant Metro Government's expenditure of municipal tax revenues on the 287(g) program violates the Metro Charter and state law governing the expenditure of tax revenues by municipal corporations;

4. Defendants Metro Government and ICE violated Plaintiff Renteria's right under the Fourteenth Amendment to due process;

(b) Issue a Preliminary and then a Permanent Injunction enjoining the Metro Government, by and through the DCSO, from continuing to execute the 287(g) Agreement; or, in the alternative, issue a Preliminary and then a Permanent Injunction enjoining the DCSO from performing the following functions because the performance of these functions violates the Metro Charter and *Metro v. Poe*:

1. Authorizing, allowing, or directing DCSO personnel to perform the federal immigration law enforcement function of "interrogation," as delegated in Appendix D of the Agreement and defined at 8 U.S.C. § 1357(a)(1) and 8 C.F.R. § 287.5(a)(1); and

2. Authorizing, allowing or directing DCSO personnel to perform the federal immigration law enforcement functions of "tak[ing] and consider[ing]

evidence" as delegated in Appendix D of the Agreement and defined at 8

U.S.C. § 1357(b) and 8 C.F.R. § 287.5(a)(2);

3. Expending revenues from municipal taxpayers to fund the 8 corrections

officers, 2 supervisors, and 1 program director of the DCSO's 287(g)

program.

(c)     Award Plaintiffs compensatory and punitive damages;

(d)     Award Plaintiffs reasonable costs and attorneys fees pursuant to 28 U.S.C. §

2412(d) & 5 U.S.C. §§ 504 *et seq.*

(e)     Grant Plaintiffs any further relief this Court deems equitable and just.


DATED this 19th day of April, 2011.


Respectfully submitted,

/s Elliott Ozment

Elliott Ozment, Attorney at Law
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37212
(615) 321-8888 (O)
(615) 321-5230 (F)
Email: elliott@ozmentlaw.com

26

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing has been served by electronic means via the U.S. District Court's electronic filing system on April 19, 2011 on:

Laura Barkenbus Fox
Assistant Metropolitan Attorney
Department of Law
Metro Courthouse
One Public Square — Suite 108
P.O. Box 196300
Nashville, TN 37219-6300

Keli Oliver
Assistant Metropolitan Attorney
Department of Law
Metro Courthouse
One Public Square — Suite 108
P.O. Box 196300
Nashville, TN 37219-6300

Elizabeth A. Sanders
Assistant Metropolitan Attorney
Department of Law
Metro Courthouse
One Public Square — Suite 108
P.O. Box 196300
Nashville, TN 37219-6300

Jerry E. Martin
United States Attorney
Middle District of Tennessee

Mark H. Wildasin
Assistant United States Attorney
110 9th Ave. South, Suite A-961
Nashville, Tennessee 37203-3780

Tony West
Assistant Attorney General

David J. Kline
Director

Joshua E.T. Braunstein
Assistant Director

Craig A. Defoe
Trial Attorney
United States Department of Justice
Office of Immigration Litigation
District Court Section
Ben Franklin Station, P.O. Box 868
Washington, D.C. 20044

s/ Elliott Ozment