UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DANIEL RENTERIA-VILLEGAS, and ) | |
| DAVID ERNESTO GUTIERREZ-TURCIOS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.  ) | No. 3:11-00218 |
| ) | Judge Sharp |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON COUNTY, and ) | |
| UNITED STATES IMMIGRATION AND ) | |
| CUSTOMS ENFORCEMENT, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Upon reassignment of this case to the undersigned on June 1, 2011, the following Motions were pending:

(1) Plaintiffs' Motion for Preliminary Injunction (Docket No. 3);

(2) Defendant United States Immigration and Custom Enforcement's ("ICE's") Motion to Dismiss (Docket No. 10);

(3) Defendant Metropolitan Government of Nashville and Davidson County's ("Metro's") Motion to Dismiss (Docket No. 12); and

(4) Plaintiffs' Motion for Leave to Amend Complaint (Docket No. 30).

With the exception of the Motion for Preliminary Injunction, those motions have been fully briefed by the parties. For the reasons set forth herein, the Court will grant Plaintiffs' request to amend, and deny the remaining motions as moot.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Although in its infancy, this litigation has a somewhat lengthy procedural history and presents interesting threshold issues regarding this Court's power to adjudicate a controversy filed as a declaratory judgment action in state court raising only state law claims, but removed when a federal agency – against which no affirmative relief was sought – was deemed to be an indispensable party under state law. To place the legal issues in context, the Court sets forth the case's history in some detail.[1]

The centerpiece of this case is an October 2009 Memorandum of Agreement ("MOA") between ICE and Metro pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g). Section 287(g) authorizes the Department of Homeland Security to enter into written agreements to train and deputize local law enforcement officers to perform specified acts relating to immigration enforcement. 11 U.S.C. §§ 1357(g)(1), (2) & (5). When performing duties under Section 287 (g), local law enforcement officers act under the direction and supervision of the United States Attorney General. Id. § (g)(3).

Metro entered into the MOA "by and through" the Davidson County Sheriff's Office ("DCSO"). (Agreement, Docket No. 1-1 at 39). Under the MOA, Metro agreed that ICE would train and certify "DCSO personnel to perform certain immigration enforcement functions," and agreed that "[i]t is the intent of the parties that these delegated authorities will enable DCSO to identify and process immigration violations and conduct criminal investigations under ICE supervision." (Id.).

Metro's agreement allowing DCSO personnel to perform immigration enforcement tasks

---

[1] For purposes of the pending motions, the factual allegations in the various incarnations of the Complaint are set forth as if true.

served as the catalyst for this suit after Plaintiff Daniel Renteria-Villegas ("Mr. Renteria"), a natural born United States citizen, was arrested on August 14, 2010, by Metropolitan Nashville Police Department ("MNPD") officers and taken to the Criminal Justice Center ("CJC")[2] for booking. According to the original Complaint filed in state court, both the arrest report, and the booking documents indicated that Mr. Renteria was born in Portland, Oregon. Nevertheless, he was allegedly placed under an "ICE hold," which, in DCSO's vernacular, meant that he was being held under Section 287(g) for suspected violation(s) of immigration and/or federal criminal law. Mr. Renteria was not released until August 20, 2010, when his family provide DCSO employees with his original passport and birth certificate.

Mr. Renteria's freedom was short-lived. On August 22, 2010, MNPD Officer Rickey Bearden arrested Mr. Renteria on a new charge. Officer Bearden indicated on the arrest report that Mr. Renteria was born in Mexico, even though he did not ask Mr. Renteria about his place of birth. During booking at the CJC, Mr. Renteria was asked about his birthplace, and he told the jail officer that he was born in Portland, Oregon, and a notation was made in his record to that effect. Again, Mr. Renteria was placed under an "ICE hold."

On August 24, 2010, Mr. Renteria was subjected to an "ICE interview," during which he was informed that he was suspected of having lied about being born in the United States. Even though Mr. Renteria answered numerous questions which should have resolved any doubt about his citizenship, the "ICE hold" was not lifted until September 3, 2010, when his family again presented the originals of his birth certificate and passport to DCSO personnel. He was released early the next day.

---

[2] The CJC is under the control of the Davidson County Sheriff and manned by DCSO personnel.

Based on these events, Mr. Renteria filed a six-count Verified Complaint in the Davidson County Chancery Court on January 7, 2011, against Metro, Officer Beardon, and Daron Hall, the Sheriff of Davidson County. In the Verified Complaint, Mr. Renteria alleged: (1) the MOA between Metro and ICE violated the Nashville Metropolitan Charter ("Charter") and Poe v. Metro. Gov't. of Nashville & Davidson County, 383 S.W.2d 265 (Tenn. 1964), a Tennessee Supreme Court decision interpreting that Charter, (Counts I & II); (2) his due process rights under Article I, Section 8 of the Tennessee Constitution were violated, (Count III); (3) he was subjected to malicious harassment in violation of Tenn. Code Ann. §§ 4-21-701 & 702, (Counts IV & V); and (4) he was falsely imprisoned in violation of state common law, (Count VI).

On February 14, 2011, Mr. Renteria filed a First Amended Verified Complaint which significantly limited his claims, and focused on his August 22, 2010, arrest and subsequent incarceration at the CJC. Metro was named as the sole Defendant. Mr. Renteria sought only declaratory and injunctive relief, claiming that, by entering into the MOA, Metro violated the Charter and Poe.

In response to a Motion to Dismiss filed by Metro, the Chancery Court entered an Order on February 22, 2011, finding that the United States was an indispensable party under state law. In doing so, the Chancery Court observed that ICE was a party to the MOA, and the Verified Complaint sought a declaration that the MOA was void because it allegedly provided authority to the DCSO beyond those allowed in the Charter. Since "all persons shall be made parties who have or claim any interest which would be affected by the declaration," Tenn. Code Ann. § 29-14-107(a), and since the United States' interests could be affected were the MOA declared invalid, the Chancery Court deemed the United States indispensable to the litigation and allowed Mr. Renteria thirty days to add the United States as a party. (Docket No. 1-3 at 2).

On March 2, 2011, Mr. Renteria filed his Second Amended Verified Complaint, adding Ernesto Gutierrez-Turcios ("Mr. Gutierrez") as a Plaintiff and ICE as a Defendant. Like the most recent iteration of the Complaint, the sole claim for relief was premised on the contention that Metro's entry into the MOA was a violation of the Charter because it wrongfully granted additional law enforcement powers to the DCSO. Plaintiffs asked the Chancery Court to declare that the MOA violated the Charter, and enjoin DCSO from acting under the MOA.

With respect to Mr. Gutierrez, the Second Amended Verified Complaint alleges that he was arrested by MNPD officers after a traffic stop on April 12, 2010, taken to the CJC, and placed on an "ICE hold." Shortly thereafter, Mr. Gutierrez was interrogated by a DCSO officer in an effort to determine his immigration status, and whether he had violated any federal criminal laws. Upon questioning, Mr. Gutierrez informed DCSO personnel that, while he was born in Honduras, he was a lawful permanent resident of the United States. DCSO personnel then ran Mr. Gutierrez's social security number and were apparently satisfied that he was lawfully in the United States.

Mr. Gutierrez intends to pled guilty and to serve a several day sentence in a facility run by the DSCO. He is fearful that when he arrives for his sentence he will be subjected to another "ICE hold." This is not insignificant because inmates under an "ICE hold" are automatically categorized as medium security offenders.

ICE removed the action to this Court on March 9, 2011. The basis for removal was the federal officer and agency removal statute, 28 U.S.C. § 1442(a)(1).

Within days of removal, Plaintiffs filed a Motion for Preliminary Injunction (Docket No. 3). In that Motion, Plaintiffs ask the Court to enjoin enforcement of the MOA, pending a decision on the merits as to whether Metro's entry into the MOA violates the Charter. In doing so, Plaintiffs allege that they, along with more than 14,000 other inmates, have been harmed by DCSO's participation

in the Section 287(g) program.

Subsequently, both Defendants filed Motions to Dismiss. In its Motion, ICE argues that dismissal is appropriate because it is nothing more than a nominal Defendant, in that no claim or any request for relief is made against ICE. ICE also asks the Court to find, contrary to the Chancery Court's ruling, that ICE is not an indispensable party. ICE request that it be dismissed from this lawsuit with prejudice so as to preclude the possibility that, if the case is subsequently remanded to state court, ICE will not again be deemed to be an indispensable party by the Chancery Court.

For its part, Metro raises three arguments in support of dismissal. First, Metro argues this Court lacks subject matter jurisdiction because neither Plaintiff can show any real and immediate threat of harm so as to have standing to bring a claim for declaratory and injunctive relief. Second, Metro claims the Second Amended Verified Complaint fails to state a claim because the MOA does not violate the Charter as alleged by Plaintiffs. Third, Metro contends the Second Amended Complaint fails to state a claim for declaratory relief because, even if the MOA is deemed void, the controversy regarding DCSO's practice of making inquiries into the citizenship of arrestees will continue under a statute that requires all jail keepers to verify the citizenship of arrestees.

In addition to filing responses to the Motions to Dismiss, Plaintiffs filed a Motion to Amend the Complaint, together with a proposed Third Amended Complaint intended to address some of the concerns raised by Defendants' Motions. The proposed Complaint adds an additional Plaintiff and several new causes of action.

Specifically, the proposed Complaint alleges that Rosa Landaverde, a native of El Salvador who has held Temporary Protected Status since 2001, is a Davidson County property owner and taxpayer. She claims harm because her son is currently in removal proceedings as a result of DCSO's participation in the Section 287(g) program. Further, the proposed Complaint adds two federal

6

claims, including a claim that, by entering into the MOA, ICE violated the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.*, and a claim that both Defendants violated the Due Process Clause of the Fourteenth Amendment. The proposed Complaint also renews Mr. Renteria's claim that he was falsely imprisoned by Metro.

After the foregoing Motions were filed, an Order was entered on April 21, 2011, addressing certain housekeeping matters. Among other things, the Order granted ICE's Motion to Stay (which Metro supported and Plaintiffs did not oppose), and provided that ICE would not be required to respond to Plaintiffs' Motion for Preliminary Injunction until further order of the Court. (Docket No. 33 at 1). The Order also provided that, in responding to Plaintiffs' Motion to Amend, Defendants were to address whether their Motions to Dismiss would be moot if the Court allowed the filing of the Third Amended Complaint. (Id.).

In accordance with the Order and in response to Plaintiffs' Motion to Amend, ICE indicated it had no objection to Plaintiffs filing an Amended Complaint and that, if the proposed complaint were filed, ICE's previously filed Motion to Dismiss would be rendered moot. (Docket No. 35 at 1-2). For its part, Metro objected to amendment because Plaintiffs allegedly lack standing, but conceded that, "the filing of the Third Amended Complaint *would* moot the motion to dismiss from a technical pleading standpoint." (Docket No. 34 at 2, italics in original). Both Defendants reserved the right to file renewed Motions to Dismiss the Third Amended Complaint.

## II. LEGAL ANALYSIS

As indicated, there are several pending Motions before the Court. Because resolution of Plaintiffs' Motion to Amend directly impacts the other motions, the Court addresses it first.

"The district court has broad discretion to permit or deny a motion to amend." Semco, Inc.

7

v. Amcast, Inc., 52 F.3d 108, 114 (6th Cir. 1995). When a party seeks leave to amend a pleading, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "However, motions to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" United States v. Gibson, 2011 WL 2008308 at *3 (6th Cir. May 24, 2011) (citation omitted).

Here, Metro does not argue that Plaintiffs' Motion to Amend is brought for an improper purpose, that the amendment would cause delay, that it would suffer prejudice, or even the that amendment would be futile. Rather, Metro objects to the amendment on the grounds of "nullity" because Plaintiffs allegedly lack standing under Article III of the United States Constitution.

The Court's power to adjudicate is limited to "cases and controversies" under Article III. U.S. Const., art. III, § 2, cl. 1. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The Supreme Court has defined standing generally as "the question of . . . whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975).

Standing must exist at the time of filing of the complaint, and "does not have to be maintained throughout all stages of the litigation." Cleveland Branch, N.A.A.C.P. v. City of Parma, 263 F.3d 513, 524 & 526 (6th Cir. 2001). The Complaint is construed in Plaintiffs' favor for purposes of determining standing, and all material allegations are accepted as true. Courtney v. Smith, 297 F.3d 455, 459 (6th Cir. 2002); Greater Cincinnati Coalition fo the Homeless v. City of Cincinnati, 56 F.3d 710, 715 (6th Cir. 1995). In this case, the Complaint was "filed" when the action was removed, making the Second Amended Complaint the operative one for determining standing.

As a preliminary matter, Metro raises the procedural argument that this Court has no

jurisdiction to even consider the Motion to Amend because of the alleged lack of standing. In support of that position, Metro relies upon Zurich Ins. Co. v. Logitrans, Inc., 297 F.3d 528 (6th Cir. 2002) for the proposition that "[t]he Sixth Circuit has expressly held that a plaintiff cannot amend a jurisdictionally defective complaint to retroactively confer jurisdiction upon a court." (Docket No. 34 at 3). While that may be so as a general proposition, this Court's jurisdiction was invoked by the United States, even though there was no suggestion of a federal cause of action, or even a potential federal defense. See, City of Cookeville v. Upper Cumberland Elec. Membership Corp.,484 F.3d 380, 389 (6th Cir. 2007) (federal agency has a right to remove under 28 U.S.C. 1442(a)(1) simply because it has been sued in state court).[3]

In this regard, Zurich is distinguishable because it involved a negligence suit initially filed in federal court by a party which had no standing to bring the action in the first place, and, therefore, no standing to move to substitute a party which could have brought the action. Moreover, the underlying premise that a court can never allow a Motion to Amend to correct a perceived standing problem is incorrect. See, Revell v. Port Auth. of New York, 321 Fed Appx. 113, 118 (3rd Cir. 2009) (finding court abused discretion by not allowing reasonable opportunity to amend to establish standing); Stevens v. Premier Cruises, Inc., 215 F.3d 1237, 1238 (11th Cir. 2000) (leave to amend should have been granted where "proffered amended complaint would have cured the defect about standing in the original complaint").

Even though the Court's analysis could end here, the Court addresses Metro's substantive

---

[3] Metro asserts that "the Sixth Circuit specifically stated in City of Cookeville that § 1442 cannot overcome the jurisdiction defect of lack of standing," and cites footnote 5 of the opinion for that proposition of law. (Docket No. 41 at 2). However, the referenced footnote says no such thing. Rather, the Sixth Circuit's concern in that case was whether a federal agency needed to posit a federal claim or defense in order to remove an action from state court, and the court concluded that, under Section 1442(a)(1), "a federal agency may remove without more." City of Cookeville, 484 F.3d at 390.

9

arguments on the issue of standing. This is because Plaintiffs have made clear that their primary objective is to secure a declaration that Metro violated the Charter by entering into the MOA, the parties have fully briefed the standing issue in relation to that request, and it would make little since to allow an Amended Complaint to be filed, only to later rule that Plaintiffs have no standing to pursue their primary claim.

The linchpin of Metro's substantive argument is that Plaintiffs lack standing because, in the Second Amended Complaint, they seek only injunctive and declaratory relief, but there is no suggestion of any real and immediate threat of future harm. Such a showing is essential, Metro claims, because "[t]he Sixth Circuit has consistently and repeatedly rejected the notion that past injury can confer standing for declaratory and injunctive relief." (Docket No. 34 at 5, collecting cases). While the Court acknowledges that Metro correctly sets forth the law in the Sixth Circuit regarding standing for declaratory and injunctive relief under Article III, see, Grendell v. Ohio Supreme Court, 252 F.3d 828 , 832 (6th Cir. 2001) (past exposure to wrongful conduct does not show present case or controversy), the Court is unpersuaded by Metro's arguments as applied in this case for two reasons.

First, Metro errs in addressing standing only under Article III. "The seemingly obvious proposition that a removed case may not go forward in federal court unless Article III standing requirements are met as to some claims may not obtain in cases removed to federal court pursuant to *all* removal statutes." Lee v. Amer. Nat'l Ins. Co., 260 F.3d 997, 1002 n.4 (9th Cir. 2001) (italics added). In fact, as noted in Lee, the United States Supreme Court in Int'l Primate Protection League v. Administrators of Tulane Educ. Fund, 500 U.S. 72, 78 (1991), specifically "left open the question whether a federal court in a § 1442(a)(1) removal case may require plaintiffs to meet Article III's standing requirements with respect to the state-law claims over which the federal court exercises

pendant jurisdiction." This Court has found no controlling case which directly answers that question, but a recent unpublished decision by the Sixth Circuit indicates that a plaintiff who has standing under state law for purposes of a state declaratory judgment action, has standing for purposes of that same cause of action when the action is removed under Section 1441.

In <u>Aarti Hospitality, LLC v. City of Grove City</u>, 350 Fed. Appx. 1 (6th Cir. 2009), a group of hotel owners, who were originally from India, filed suit in state court against the city and others after the city passed a tax abatement ordinance and approved certain design plans which benefitted the plaintiffs' competitors. Among other things, plaintiffs sought a declaratory judgment that the ordinance was void under Ohio law, and asserted federal claims under 42 U.S.C. § 1983. After removal, the district court dismissed the request for declaratory relief on the grounds that plaintiffs' alleged injury was insufficient to confer standing under Ohio's Declaratory Judgment Act, and ruled that plaintiffs had failed to establish any federal law claims.

On appeal, the Sixth Circuit, while ultimately affirming the trial court, "first assess[ed] if the district court erred in not considering whether plaintiffs satisfied the *constitutional* standing requirement of Article III of the United States Constitution." <u>Id</u>. at 6 (italics in original). After noting that "Article III standing is 'the threshold question in every federal case,'" and that a court may determine jurisdictional issues in any sequence, the Sixth Circuit wrote:

> [B]ecause plaintiffs' right to relief on these state law claims arises solely from an Ohio statute, the crucial inquiry is whether Ohio law, not federal law, authorizes the remedy sought. The law is well-settled that a federal court exercising supplemental or diversity subject matter jurisdiction over state law claims must apply state substantive law to those claims. 28 U.S.C. § 1652; <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 427 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78-79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Whether plaintiffs have standing to seek a declaratory judgment under Ohio Revised Code § 2721.03 is a question of Ohio substantive, not federal procedural, law. See <u>Zicherman v. Korean Air Lines Co.</u>, 516 U.S. 217, 225, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (holding that the issue of "who may bring suit" is a "substantive

11

> question[]" that must "be answered by the domestic law selected by the courts of the contracting states."); Int'l Primate Protection League and its Members v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) (approving the principle that "standing 'should be seen as a question of substantive law, answerable by reference to the statutory ... provision whose protection is invoked.'") (quoting Fletcher, THE STRUCTURE OF STANDING, 98 Yale L.J. 221, 229 (1988)); Ragan v. Merchants Transfer & Warehouse Co., 337 U.S. 530, 532, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949) ("[T]he rights enjoyed under local law should not vary because enforcement of those rights was sought in the federal court rather than in the state court. If recovery could not be had in the state court, it should be denied in the federal court.").
>
> \* \* \*
>
> Thus, on facts similar to those in this case, the Eighth Circuit in Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733 (8th Cir.1982) applied state substantive law to determine whether the plaintiffs had standing to challenge the validity of a city's zoning ordinances. Affirming the district court's grant of summary judgment in favor of the city, the Eighth Circuit held (without addressing Article III standing) that the plaintiffs' allegation of "mere competitive disadvantage" resulting from the ordinances "does not give rise to standing" under Missouri law. Id. at 747-48.

Id. at 6-7; see also, Bennett v. MIS Corp., 607 F.3d 1076, 1091 n. 13 (6th Cir. 2010) (citation omitted) ("when removal of a state court action is available because the defendant is a federal officer, the substantive law to be applied is unaffected by removal. If state law was applicable before the removal, it will apply after the removal").

For all practical purposes, the posture of this case when originally filed is no different than the posture of Aarti when it was filed. Both cases involve a pleading filed in state court raising a state court declaratory judgment claim which was later removed to federal court. If anything, this case presents a stronger reason for applying the state's standing rules since, unlike the Aarti plaintiffs, Mr. Renteria's original Verified Complaint presented no federal claims, named no federal Defendant, and the case arrived in this Court only because Mr. Renteria was required by the state court to add ICE as a Defendant.

"In its present form, the Tennessee Declaratory Judgment Act grants courts of record the

12

power to declare rights, status, and other legal relations." Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 837 (Tenn. 2008). "The Act also conveys the power to construe or determine the validity of any written instrument, statute, ordinance, contract, or franchise, provided that the case is within the court's jurisdiction." Id. Specifically,

> [a]ny person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

Tenn. Code Ann. 29-14-103.

To bring a case under the Act, a plaintiff does not need to show a present injury, although an "actual 'case' or 'controversy' is required." Colonial Pipeline, 263 S.W.3d at 837. "A bona fide disagreement must exist; that is, some real interest must be in dispute" because a court "may not render advisory opinions based on hypothetical facts." Id. at 838.

In this case, both Plaintiffs are interested parties in relation not only to the MOA, but also in relation to how the Charter is construed. As Davidson County residents who have been subjected to the 287(g) program and who allegedly will be subjected to that program if they are ever again arrested, they present an actual case or controversy and have standing to bring a Declaratory Judgment Action under Tennessee law. See, Doe v. Gwyn, 2011 WL 1344996 at *7 (Tenn. Ct. App. 2011) (sex offender had standing to file declaratory action challenging statute which would require him to register as a sex offender); Robinson v. Metro. Gov't of Nashville, 1992 WL 205268 at *3 (Tenn. App. 1992) ("[p]ersons affected by municipal ordinances have standing to request a

declaratory judgment" under Tenn. Code Ann. § 29-14-103).[4] The conclusion that standing exists under the facts presented here is in keeping with the liberal construction afforded the Tennessee Declaratory Judgment Act, Williams v. Hirsch, 2011 WL 303257 at *2 (Tenn. Ct. App. 2011), and the long-standing principle in Tennessee that citizens have standing to challenge the actions of public officials where they "aver special interest or a special injury not common to the public generally." Bennett v. Stutts, 521 S.W.2d 575, 576 (Tenn. 1975).

Second, even assuming for purposes of *both* declaratory *and* injunctive relief[5] a plaintiff must show the immediate threat of real harm (as opposed to merely showing past injury) under federal law, it does not follow that there is no standing in this case. This is because, at least with respect to Mr. Gutierrez, the allegations show past harm and more than a theoretical possibility of future harm. See, Browher v. Synar, 478 U.S. 714, 721 (1986) (where standing exists with respect to at least one plaintiff, a court need not consider whether the other plaintiffs also have standing).

According to the Second Amended Complaint, after Mr. Gutierrez was arrested and taken to the CJC, he was investigated pursuant to the Section 287(g) program and in accordance with the MOA. Mr. Gutierrez suffered at least a modicum of harm because he was treated differently than other inmates who did not appear to be of Latino origin, and he was automatically classified as a medium security inmate as a result of being placed under an "ICE hold." Further, when the

---

[4] Under Tennessee law, the same rules of construction apply to statutes, ordinances and charters. Metro. Elec. Power Bd. v. Metro Gov't of Nashville & Davidson County, 309 S.W.2d 474, 477 (Tenn. Ct. App. 2009).

[5] In the Second Amended Complaint, the sole "Cause of Action" is a request for a declaratory judgment, with the request for an injunction appearing as part of the prayer for relief. Though rare, it is possible for a plaintiff to have standing for declaratory, but not injunctive, relief. See, Samuels v. Mackell, 401 U.S. 66, 73 (1970) (there are "unusual circumstances" in which an injunction might be withheld, not withstanding the granting of a declaratory judgment). The Court need not decide if this is that rare case since Plaintiffs have standing to pursue both a declaration and an injunction.

allegations are construed in Plaintiffs' favor, that harm is bound to be repeated because he has entered into a plea agreement which requires that he spend several days in a DCSO jail. (Second Amended Complaint ¶¶ 66-67). That Mr. Gutierrez will again be subjected to an interrogation and investigation under the 287(g) program is not mere speculation because the Sheriff of Davidson County has allegedly "stated under oath that it is the DCSO's policy to subject every person who enters the Davidson County Jail system to a 287(g) investigation, if they are or may be foreign-born." (Id. ¶ 68).[6]

Certainly in Mr. Gutierrez' situation there exists a future threat of injury that is "both real and immediate, not conjectural or hypothetical," City of Los Angeles v. Lyon, 461 U.S. 95, 101-02 (1983), and this threat may be eliminated by the declaration that the MOA is void and/or an injunction prohibiting its enforcement. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." Friends of the Earth Inc. v. Laidlow Environ. Serv's Inc., 528 U.S. 167,183 (2000).[7]

In reaching this conclusion, the Court has considered Metro's contention that Mr. Gutierrez suffered no harm because his release was not delayed, and its contention (set forth in the papers supporting its Motion to Dismiss) that a favorable decision will not aid either Plaintiff because jailers are required under state law to determine the immigration status of prisoners. The Court rejects both

---

[6] This conclusion is further underscored by Mr. Renteria's alleged treatment after he was rearrested and returned to the CJC two days after being released.

[7] In its Motion to Dismiss (which also addresses the standing issue) Metro claims that Mr. Gutierrez will not, in fact, be subjected to further immigration screening because, under the plea agreement, he is only required to serve weekends in jail. According to Metro, those serving weekend sentences are all "minimum security" inmates and are not subjected to being "screened by ICE." (Docket No. 14 at 10). While the contention is supported by a Declaration from an Administrative Services Manager at the DCSO, it at most raises a factual issue.

arguments.

With respect to the former, Mr. Gutierrez, unlike non-Latinos, was subjected to an "interrogation" by DCSO personnel. While Metro might view this as nothing more than an inconvenience, the "injury in fact" requirement delimits litigation in federal court to persons with a stake in the outcome. United States v. Students Challenging Regulatory Agency, 312 U.S. 669, 690 n. 14 (1974). Even though "'[t]he contours of the injury-in-fact requirement [are] not precisely defined, [they] are very generous,'" and the "standard is met as long as the party alleges a specific, 'identifiable trifle' of injury." In re Global Indus. Tech., Inc., 2011 WL 1662792 at *5 (3rd Cir. May 4, 2011) (citation omitted); see also, Common Cause/Georgia v. Billups, 554 F.3d 1340, 1349 (11th Cir. 2009) (a "small injury" is sufficient to confer standing); Preminger v. Peake, 552 F.3d 757, 763 (9th Cir. 2008) (for purposes of standing, "[t]he injury may be minimal").

As for the latter, Metro has not shown that the state law requirements for immigration screening are anywhere near as rigorous as those conducted under a Section 287(g) program. It cites Tenn. Code Ann. § 40-7-123, but that statute merely says that the Tennessee Peace Officers Standards and Training Commission "shall develop a standardized written procedure for verifying the citizenship status of individuals who are arrested, booked, or confined for any period in a county or municipal jail," and that jailers are to comply with those procedures "to verify the citizenship status" of inmates who come into their custody. Id. §§ (a) & (b).

Because ICE does not object to amendment and the Court rejects Metro's argument on standing, the Court will allow Plaintiffs to file the Amended Complaint. "Once an amended pleading is filed, the original pleading no longer serves a function in the cases and is considered to have no effect." Holt v. City of Dickson, 2011 WL 134249 at *2 (M.D. Tenn. 2011) (collecting cases). Therefore, the Court will deny the remaining motions as moot.

The Court recognizes that Plaintiff's Motion for Preliminary Injunction has been pending since March 16, 2011. However, it does not appear that Plaintiffs require an urgent resolution of that Motion since they did not object to ICE's Motion to Stay pending a ruling on the Motions to Dismiss. Moreover, because ICE has not responded to the Motion for Preliminary Injunction and the Third Amended Complaint adds numerous factual allegations, an additional Plaintiff and three new causes of action, any request for injunctive relief should be addressed in the context of the now operative Complaint.

### III. CONCLUSION

On the basis of the foregoing, Plaintiffs' Motion for Leave to Amend Complaint will be granted. The Motions to Dismiss filed by Defendants will be denied as moot, as will Plaintiffs' Motion for Preliminary Injunction. The parties will be allowed to file similar motions in relation to the Third Amended Complaint, if warranted.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE