| | |
|---|---|
| **DANIEL RENTERIA-VILLEGAS, DAVID** ) | |
| **ERNESTO GUTIERREZ-TURCIOS, and** ) | |
| **ROSA LANDAVERDE,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:11-00218** |
| ) | **Judge Sharp** |
| **METROPOLITAN GOVERNMENT OF** ) | |
| **NASHVILLE AND DAVIDSON COUNTY, and** ) | |
| **UNITED STATES IMMIGRATION AND** ) | |
| **CUSTOMS ENFORCEMENT,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Pending before the Court is Defendant United States Immigration and Custom Enforcement's ("ICE's") Motion to Dismiss Counts II and III (Docket No. 54). That Motion has been fully briefed by ICE and Plaintiffs. (Docket Nos. 55, 58 & 67). Also pending is Plaintiffs' Motion for Partial Summary Judgment Finding Defendants Liable Under Counts I and II (Docket No. 69), Defendant Metropolitan Government of Nashville & Davidson County's ("Metro's") Motion to Hold Plaintiffs' Motion for Partial Summary Judgment in Abeyance (Docket No. 72), and Metro's Motion to Open Case for Necessary Discovery (Docket No. 75). For the reasons set forth below, the Court will grant ICE's Motion to Dismiss Count III insofar as it alleges that ICE violated Plaintiffs' rights to due process, but deny ICE's Motion to Dismiss Count II. All remaining motions will be denied pending certification of the dispositive issue in this case to the Tennessee Supreme Court.

## I. GENERAL BACKGROUND

In a June 21, 2011, Order and Memorandum (Docket Nos. 43 & 44), the Court detailed the

1

procedural history and the factual allegations underlying this litigation.  See, Renteria-Villegas v. Metro. Gov't of Nashville & Davidson County, 2011 WL 2471585 at ** 1-4 (M.D. Tenn. June 21, 2011) (Renteria I).   Basically, this case presents a challenge to an October 2009 Memorandum of Agreement ("MOA" or "287(g) Agreement") between ICE and Metro pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), which authorizes the Department of Homeland Security to enter into written agreements to train and deputize local law enforcement officers to perform specified acts relating to immigration enforcement.  The MOA empowers Davidson County Sheriff's Office ("DCSO") deputies to perform those immigration enforcement acts.

The case began when  Plaintiff  Renteria-Villegas ("Renteria"), a natural born United States citizen, filed suit in the Davidson County Chancery Court on January 7, 2011, against Metro, a city police Officer , and the Sheriff of Davidson County, Daron Hall ("Sheriff Hall").  Renteria's primary complaint was that the MOA violated the Nashville Metropolitan Charter ("Charter") and Poe v. Metro. Gov't. of Nashville & Davidson County, 383 S.W.2d 265 (Tenn. 1964), a Tennessee Supreme Court decision interpreting the Charter.   After an Amended Complaint was filed, and after the Chancery Court Judge found that ICE was an indispensable party to the MOA for purposes of declaratory relief, Renteria again amended his Complaint, adding David Gutierrez-Turcios ("Gutierrez"), a lawful permanent resident of the United States, as an additional Plaintiff and ICE as a Defendant.  ICE then removed the case to this Court and the Court allowed Plaintiffs to once again amend their Complaint.

In the presently controlling Third Amended Complaint (Docket No. 45) (which will simply be referred to hereafter as "the Complaint"), Rosa Landaverde ("Landaverde"), a Davidson County resident holding temporary protected status, was added as a Plaintiff.  Metro and ICE are the only

named Defendants. The Complaint sets forth four causes of action: In Count I, Plaintiffs allege that, by entering into the MOA, Metro violated the Charter. In Count II, Renteria and Gutierrez allege that ICE violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq*. In Count III, Renteria alleges that both Defendants violated the Due Process Clause of the Fourteenth Amendment. Finally, In Count IV, Renteria sets forth a state law claim for false imprisonment against Metro.

## II. <u>LEGAL DISCUSSION</u>

The four pending motions are, to an extent, interrelated in that the continued viability of Plaintiffs' Motion for Partial Summary Judgment, Metro's Motion to Hold in Abeyance, and Metro's Motion to Allow Necessary Discovery hinge on this Court's disposition of ICE's Motion to Dismiss. Accordingly, the Court addresses the Motion to Dismiss first.

### A. <u>ICE's Motion to Dismiss</u>

ICE seeks dismissal of Counts II and III, which are the only claims made against it. Prior to reaching the specific substantive arguments raised with respect to each Count, the Court first acknowledges that ICE moves to dismiss both Counts because Plaintiffs allegedly cannot "establish standing to challenge the 287(g) Agreement because neither of them can show that there is an imminent risk that they will be subject to the 287(g) program in the future." (Docket No. 55 at 8). In both the decision allowing Plaintiffs' Motion to Amend, as well as a subsequent Order and Memorandum that denied Metro's request that it be allowed to take an interlocutory appeal of that ruling, the Court discussed Plaintiffs' standing in detail. <u>See</u>, <u>Renteria I</u>, 2011 WL 2471585 at **5-10; <u>Renteria-Villegas v. Metro. Govt. of Nashville and Davidson County</u>, 2011 WL 2938428 at **1-3 (M.D. Tenn. July 19, 2011) ("<u>Renteria II</u>"). The Court finds no need to revisit those rulings, other than to address a couple of points raised by ICE in its Motion to Dismiss.

ICE states:

> In its Memorandum granting plaintiffs' motion to file the TAC, the Court
> addressed and rejected Metro Government's challenge to Plaintiffs' standing to bring
> "state-law claims" in their proposed TAC. (See ECF No. 43 at 10). In their TAC,
> plaintiffs now sue ICE for allegedly violating federal law. As such, their standing to
> sue ICE is a "matter of federal law" that "does not depend on [their] prior standing
> in state court." Coyne v. Am. Tobacco Co., 183 F.3d 488, 495 (6th Cir. 1999).
> Because Plaintiffs base their claims against ICE on violations of federal law, federal
> standing requirements necessarily apply to those claims.

(Docket No. 55 at 8 n.5). In the Court's view, ICE reads Renteria I too narrowly, relies upon an

inapposite case, and neglects to consider that Plaintiffs have now added a claim under the APA.

In addressing standing in Renteria I, the Court began by observing that, because the action

was removed to this Court by a federal agency, Metro erred in addressing standing only under Article

III. However, the Court went on to write: "even assuming for purposes of both declaratory and

injunctive relief a plaintiff must show the immediate threat of real harm (as opposed to merely

showing past injury) under federal law, it does not follow that there is no standing in this case. This

is because, at least with respect to Mr. Gutierrez, the allegations show past harm and more than a

theoretical possibility of future harm." Renteria I, 2011 WL 2471585 at *9 (italics and footnote

omitted). The Court then went on to amplify its reasons for that conclusion.

Indeed, a primary case upon which ICE relies, City of Los Angeles v. Lyons, 461 U.S. 95,

101–02 (1983), was considered by the Court in Renteria I. However, this case – in which Plaintiffs

allege they have been subjected to 287(g) investigations, and in which they allege that anyone who

appears foreign-born is subjected to such an investigation upon entry into a DCSO facility – is

markedly different from the allegations in Lyons that rogue police officers violated departmental

policy by placing compliant motorists in unauthorized chokeholds.

Further, ICE's reliance on Coyne is misplaced. There, a group of citizens purported to

represent the State of Ohio and Ohio taxpayers and sought to recover state monies that had been spent

4

treating citizens suffering from tobacco-related illnesses.  The Sixth Circuit held that the plaintiffs lacked standing because their injuries were "not direct or particularized," and they could not show that a favorable outcome would result in either the receipt of a tax refund by them or a reduction in the tax bill of Ohioans generally since "the power to decrease state taxes or issue a tax refund rests within the province of the legislative and executive branches of the State of Ohio." Coyne, 183 F.3d at 496.  Here, at least insofar as Plaintiffs Renteria and Gutierrez are concerned, Plaintiffs have suffered a direct and particularized injury by virtue of being subjected to 287(g) investigations,[1] and they would receive a favorable outcome were the Court to rule in their favor since, presumably, they would not again be subjected to the alleged indignities of such an investigation.

Moreover, as this Court ruled in both Renteria I, 2011 WL 2471585 at *9 and Renteria II, 2011 WL 2938428 at **1-2, a plaintiff may amend a complaint to address standing issues, an allowance which seems particularly *apropos* where, as here, a state court plaintiff was effectively forced to litigate claims in federal court.  When ICE removed the case, Plaintiffs added federal claims, including a claim under the APA.

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  To bring a claim under the APA in federal court a plaintiff "must not only meet the constitutional requirements of standing, but must also demonstrate prudential standing." Courtney

---

[1]  The fact that Plaintiffs have been subjected to such investigations distinguishes this case from O'Shea v. Littleton, 414 U.S. 488 (1974) upon which ICE also relies because, in Littleton, "[n]one of the named plaintiffs [wa]s identified as himself having suffered any injury in the manner specified," and they claimed harm by one defendant "only in the most general terms." Id. at 495.  Although this case shares a common thread with Littleton to the extent that the possibility of future harm partially depends upon Plaintiffs' own conduct, this case is also distinguishable from Littleton because "[i]mportant to this assessment" in Littleton was "the absence of allegations that" the statute upon which their complaint was based was unlawful.  Here, of course, the very essence of this lawsuit is that the MOA is unlawful because it violates the Charter.

v. Smith, 297 F.3d 455, 460 (6th Cir. 2002).

"To demonstrate constitutional standing, a plaintiff must satisfy the following three elements: (1) an allegation of an 'injury in fact,' which is a concrete harm suffered by the plaintiff that is actual or imminent, rather than conjectural or hypothetical; (2) a demonstration of 'causation,' which is a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) a demonstration of 'redressability,' which is a likelihood that the requested relief will redress the alleged injury." Friends of Tim Fords v. Tennessee Valley Auth., 585 F.3d 955, 966 (6th Cir. 2009). "Prudential standing is . . . met if the plaintiff alleges it suffered a legal wrong," which "must relate to " 'agency action,' which is defined to include 'failure to act.'" Id. at 967.

In this case, Plaintiffs point to a relevant statute, to wit, 8 U.S.C. § 1387(g)(1), which they claim "explicitly provides that federal immigration law enforcement functions may be performed by state and local law enforcement officers only 'to the extent consistent with State and local law.'" (Docket No. 45 at 22 ¶ 155). Plaintiffs have also satisfied the requirement for both constitutional and prudential standing by alleging in the Complaint that Renteria has twice been subjected to a 287(g) investigation, and Gutierrez has been subjected to that investigation once. These allegations suggest an injury-in-fact, and, for purposes of declaratory relief, the Complaint alleges the imminent threat of future harm because Gutierrez is heading back into the DCSO system and Sheriff Hall has stated that DCSO's policy is to subject every inmate who enters one of his jail facilities, and who is, or may be, foreign-born, to a 287(g) investigation.[2] Finally, there is a likelihood that a ruling favorable to

_____

[2] Where one plaintiff has standing to sue, the Court need not consider whether the other plaintiffs also have standing. See, Clinton v. City of New York, 524 U.S. 417, 431 n. 19 (1998). Nevertheless, the Court notes that, according to the allegations in the Complaint, Renteria was subjected to immigration investigations twice within a two week period. "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, Lyons, 461 U.S. at 107 n.8 (italics in original), and "[p]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." Littleton, 414 U.S. at 496.

Plaintiffs would afford relief inasmuch as Gutierrez might not be subjected to another 287(g) investigation upon his reentry into custody.

Having considered the matter of standing for the third time in relation to the pleadings, the Court has gone as far as it intends to go on the issue and turns to the other arguments raised by ICE in relation to Counts II and III. Prior to doing so, however, the Court sets forth the standard which governs this Court's review.

**1. Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (quoting, <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>.

Although the Court must accept as true all of the factual allegations contained in a complaint, the same does not hold true with respect to legal conclusions and, therefore, a complaint must include factual allegations to support the legal claims asserted. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id</u>.

**2. Count II**

ICE argues Plaintiffs "cannot receive relief under the APA because they have an adequate alternative remedy available." (Docket No. 55 at 13). In this vein, ICE asserts "Plaintiffs could (and should) have brought their claim in state court without involving ICE." (<u>Id</u>. at 14).

This is a remarkable argument given the procedural history of this case. Plaintiff Renteria did just what ICE claims he should have done: he filed a Verified Complaint in the Davidson County

Chancery Court against only city and county actors. It was only because the Chancery Court concluded that ICE was an indispensable party to the MOA that ICE was added, and it was only because ICE chose to remove the case that the litigation ended up here. It seems almost inevitable that were the case dismissed and these Plaintiffs or other plaintiffs went to Chancery Court arguing about the validity of the MOA, ICE would again be deemed an indispensable party, and the case would again end up here.

ICE refines its argument by stating that Plaintiffs should have "limited their lawsuit to challenging the DCSO officers' actions, and sought injunctive relief regarding those actions without directly challenging the validity of the 287(g) agreement[.]" (Id.). This way, ICE submits, "there likely would have been no grounds for the state court to order ICE's addition as a party to this lawsuit." (Id.).

"Yet the plaintiff, not the defendants, remains the master of a complaint, including the master of what law []he opts to invoke in filing a claim." Ohio ex rel. Skaggs v. Brunner, 629 F.3d 527, 531 (6th Cir. 2010). Central to this case from its inception has been Plaintiffs' contention that 287(g) investigations are unlawfully conducted by DCSO personnel. Simply suing the individual jailers who conduct the immigration investigations would not get to the heart of whether the MOA is valid under the Charter. Since the Chancery Court has ruled that ICE is an indispensable party and ICE has exercised its option to remove the case from state court, the state Chancery Court would not provide an adequate remedy.

If ICE's position were accepted by the Court, and if Plaintiffs are correct that Metro could not, by law, enter into the MOA with ICE, then the illegality of the MOA, and ICE's agreement to enter into it, could never be effectively redressed. This would run counter to the "presumption favoring judicial review of administrative action," Kucana v. Holder, 130 S.Ct. 827, 839 (2010), a presumption

that "has been reaffirmed over many years by Congress as embodied in Sections 702, 703 and 704 of the APA." Hamilton Stores, Inc. v. Hodel, 925 F.2d 1272, 1277 (10th Cir. 1991).

Section 704 upon which ICE exclusively relies, and which provides that final agency action is reviewable only to the extent that "there is no other adequate remedy," cannot be read in isolation. As noted previously, Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Section 703, in pertinent part, provides:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments . . . in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

5 U.S.C. § 703.

There is no special statutory review procedures relating to Section 287(g) agreements. Therefore, Plaintiffs can seek declaratory relief under the APA against ICE in this Court, particularly since the Chancery Court has ruled that a challenge to the MOA cannot go forward in the absence of ICE, and ICE has indicated it has no intention of litigating in state court.[3] See, Pinnacle Armor, Inc. v. United States, ___ F.3d ___, ___,2011 WL 2040870 at *7 (9th Cir. May 26, 2011) (collecting Supreme Court cases) (the presumption of judicial review "is overcome only in two narrow circumstances" – "when Congress expressly bars review by statute" and "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply").

---

[3] Under 28 U.S.C. § 1442(a) where a civil action is commenced in a state court against the United States or one of its agencies, the action "*may* be removed . . . to the district court of the United States for the district and division embracing the place wherein it is pending[.]" 28 U.S.C. § 1442(a) (italics added).

ICE next claims that dismissal is warranted because the allegations in the Complaint "do not demonstrate that ICE acted unlawfully by approving the DCSO 287(g) Agreement and relying on Metro Government's determination that the Agreement was consistent with state and local law." (Docket No. 55 at 14). ICE writes:

> . . . Congress did not mandate that ICE independently research whether a particular 287(g) agreement would require 287(g) officers to violate state and local law when acting under the agreement. Nor did Congress preclude ICE from relying on a state or local government entity's determination that its officials are complying with state and local law when acting under a 287(g) Agreement. In short, the INA imposes no duty on ICE to independently determine whether state and local officers comply with state and local law when they act under a 287(g) agreement. Therefore, ICE properly relied on Metro Government's determination that DCSO officials could lawfully execute the 287(g) Agreement under state and local law.

(Id. at 15). In response, Plaintiffs argue that "[w]heter ICE or DCSO was at fault for exceeding the authority granted ICE by 8 U.S.C. § 1357(g) (1) is irrelevant to the APA analysis" and the statute itself requires that immigration enforcement powers be delegated "only to the extent consistent with State and local law." (Docket No. 59 at 11 & 12).

So far as relevant, Section 287(g) provides:

(g) Performance of immigration officer functions by State officers and employees

> (1) Notwithstanding section 1342 of Title 31[4], the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

---

[4] 31 U.S.C. § 1342 places limitations on the ability of governmental officers and employees to accept voluntary services for governmental functions.

8 U.S.C. § 1357(g)(1).   Contrary to Plaintiffs' reading, the foregoing language can be read as not specifically requiring that ICE ensure that a particular 287(g) agreement be in compliance with local and state law.   Rather, and as ICE asserts, the limiting language can be read as requiring that the *actions* of local officers be consistent with state and local law, and the fact that a local officer might violate state or local law in executing a Section 287(g) agreement does not mean, perforce, that ICE violated federal law in entering into the agreement in the first place.   The limiting language can also be read in yet a third way because, arguably, one can only be "determined by the Attorney General to be *qualified* to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens," if performing the function is in compliance with local and state law.

Regardless of the gloss placed on the language, the Court rejects ICE's underlying premise that it can enter into unlawful agreements unless Congress specifically bars it from doing so through the implementing statute, and that the entry into such an agreement is barred from review.   While "[a] court must give a statute its plain and ordinary meaning and not go beyond the words of the statute where those words are sufficient to explain its meaning," In re Wright Enterprises, 76 Fed. Appx. 717, 725 (6th Cir. 2003),

courts should refrain from construing statutes to have an effect not intended by Congress.   NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 504-07 (1979).

It is unlikely that Congress, in passing Section 287(g), contemplated ICE would enter into agreements which violated state or local law, or that ICE would merely assume any agreement it enters into under Section 287(g) is in accordance with state law.   The whole statutory scheme envisions qualified local officers who work in the place of immigration officers "subject to the direction and the supervision of the Attorney General" and who are considered to be acting "under

color of Federal authority for purposes of determining liability and immunity from suit." 8 U.S.C. § 1157(g)(2) & (8). The statute grants significant federal powers to local authorities and certainly Congress envisioned that those who undertake immigration enforcement functions do so in accordance with the law.

Under Section 702(2) of the APA, "[t]he reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[]." 5 U.S.C. § 706(2)(A) & (C). "Reviewing courts are not obliged to stand aside and rubberstamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." N.L.R.B. v. Brown, 380 U.S. 278, 291 (1965). "Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions." Id. at 291-92. The Court will not dismiss Plaintiffs' APA claim as set forth in Count II, on the grounds that ICE allegedly relied on Metro's determination that the MOA was consistent with state and local law.

Finally, ICE moves to dismiss Count II because it claims the MOA does not, in fact, violate the Charter. This is the legal question upon which Plaintiffs' entire case rests, and it is one which, for the reasons explained in section II. B., below, will be certified to the Tennessee Supreme Court.

### 3. Count III

ICE moves to dismiss Count III because there is no "jurisdictional basis for the claim, and the claim is not viable under the APA." (Docket No. 55 at 23). In response, Plaintiffs eschew reliance on the APA as the substantive basis for Count III, but allege instead that Renteria's due process claim is "grounded in the plain language of 8 U.S.C. § 1357(g), and is properly before this Court." (Docket

No. 59 at 19).  In reply, the Government argues the claim "is not justiciable because [Renteria] fails

to identify any waiver of sovereign immunity" and "explicitly disavows the APA as the jurisdictional

basis for his due process claim, even though the APA is the only waiver of sovereign immunity that

possibly could apply to the claim."  (Docket No. 67 at 6).

As a preliminary matter, the Court rejects ICE's sovereign immunity argument.[5]  "Absent

a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  <u>FDIC v.</u>

<u>Meyer</u>, 510 U.S. 471, 475 (1999).  The APA contains a limited waiver of sovereign immunity.

Specifically, it allows for suits against the Untied States to "set aside agency action . . . found to be

. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C.

§ 706(2)(a), when the suit calls for "relief other than money damages."  <u>Id</u>. § 702.  Even though

Renteria's due process claim is said to arise under 8 U.S.C. § 1357(g), jurisdiction over the United

States is proper because Plaintiffs' bring a claim under the APA and the Supreme Court has held,

"[j]urisdiction over *any suit* against the Government requires a clear statement from the United States

waiving sovereign immunity, . . . together with *a claim* falling within the terms of the waiver."

<u>United States v. White Mountain Apache Tribe</u>, 537 U.S. 465, 472 (2003) (italics added, internal

citations omitted).  As the Federal Circuit has recently explained:

> The APA can be said to do three things with respect to judicial review of

---

[5]  The Court also rejects ICE's related contentions that (1) Plaintiffs fail to allege final agency action and (2) there has been no final agency action for purposes of the APA.  A two-part test is used to determine whether an agency's action is final:  "First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  <u>Bennett v. Spear</u>, 520 U.S. 154, 177-78 (1997).  Here, Plaintiffs specifically allege that "ICE's approval of the 287(g) Memorandum of Agreement constitutes final agency action." (Docket No. 45, at 22 ¶ 153).  The Court agrees that ICE's decision to enter into the MOA is a final agency action inasmuch as there is no suggestion that the agreement is tentative, and legal consequences flow from the agreement because those brought to DCSO facilities face the possibility that they will be subjected to an immigration investigation.

actions or failures to act by government agencies or employees: First, it recognizes a right of judicial review for "agency action" made reviewable by another statute and provides rules governing such review. 5 U.S.C. §§ 702, 704, 706. Second, *it creates a right of judicial review, even in the absence of a review-authorizing statute, for "final agency action" for which there is no other adequate remedy in a court.* Id. at § 704. Third, and most importantly for present purposes, *it waives sovereign immunity for any action stating a claim against the United States (or its officers or employees) and seeking relief other than money damages.* Id. at § 702. The United States and the Commission argue that the waiver of sovereign immunity is limited to the first two categories—the types of judicial review recognized or created by the APA. However, nothing in the text of section 702 limits its scope to "agency action," as defined in section 704 of the APA, or "final agency action," for which section 704 of the APA directly provides the right to judicial review. A review of the background and judicial analysis of the sovereign immunity waiver in section 702 leads us to reject the defendants' argument.

As originally enacted in 1946, the APA provided a cause of action for review of certain actions of federal agencies and officials. It did not, however, expressly waive sovereign immunity for either causes of action grounded in section 704 of the APA or for causes of action brought under other laws, such as a particular statute or the Constitution. An action that did not fall within an exception to the general principles of sovereign immunity was therefore subject to dismissal even though the action was authorized by the APA. In 1976, Congress amended the APA to solve that problem. It did so by amending section 702 to include what is now the second sentence, which consists of a broad waiver of sovereign immunity for actions seeking relief other than money damages against federal agencies, officers, or employees.

Delano Farms Co. v. California Table Grape Comm'n, ___ F.3d ___, ___, 2011 WL 3689247 at 15 (Fed. Cir. Aug. 24, 2011) (italics added); see also, Trudeau v. FTC, 456 F.3d 178, 186 (D.C. Cir. 2006) (citations omitted) ("'APA's waiver of sovereign immunity applies to any suit whether under the APA or not'" and the second sentence of Section 702 "waives sovereign immunity for '[a]n action in a court of the United States seeking relief other than money damages,' not for an action brought under the APA"); Western Shoshone Nat. Council v. United States, 408 F.Supp.2d 1040, 1048 (D. Nev. 2005) ("The APA is a specific waiver of the United States' sovereign immunity for actions for non-monetary relief brought under 28 U.S.C. § 1331"). This is the position adopted by the Sixth Circuit, United States v. City of Detroit, 329 F.3d 515, 520-21 (6th Cir. 2003), which has found that

the "APA's general waiver of sovereign immunity with respect to non-monetary claims applies to

. . . distinct constitutional claims . . . under the district court's general federal-question subject-matter

jurisdiction of 28 U.S.C. § 1331."  Hamdi v. Napolitano, 620 F.3d 615, 623 (6th Cir. 2010).

Turning to the merits of Renteria's due process claim, Count III of the Complaint is titled

"Violation of the Fourteenth Amendment Due Process Clause (42 U.S.C. § 1983, Bivens[6])."  In the

body of that count, Plaintiffs alleges:

> 164.  The following practices of Defendant Metro Government violated Plaintiffs' right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution:
>
> > a. Subjecting Renteria to custodial interrogation for the purpose of obtaining evidence of criminal violations without advising him of his right to counsel;
> >
> > b. Imprisoning without probable cause after the release of his state charges, and without the issuance of a Form I-247 detainer;
> >
> > c. Failing to give Renteria notice and an opportunity to be heard regarding the grounds for the DCSO detainer before imprisoning him pursuant to it; and
> >
> > d. Seizing Renteria's Tennessee State I.D. card and never returning it.
>
> 165.  The imprisonment of Renteria on the basis of a false detainer without due process was carried out under the guise of the 287(g) authority delegated by ICE to DCSO Jail Enforcement Officers.
>
> 166.  Upon information and belief, this imprisonment was the result of a DCSO custom, policy, and/or practice of deliberate indifference on the part of the DCSO and ICE supervisors charged with administering the 287(g) Agreement.
>
> 167.  Plaintiff seeks compensatory damages against the Metro Government and a declaratory judgment against the Metro Government and ICE declaring that his right to due process was violated.

---

[6] "Bivens" is a reference to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

(Docket No. 45 at 24-25, ¶¶ 164-167).  Grounded as it is in the Fourteenth Amendment, 42 U.S.C. § 1983 and <u>Bivens</u>, Count III, on its face, fails to state a claim against ICE.

"To state a viable claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." <u>Harbin–Bey v. Rutter</u>, 420 F.3d 571, 575 (6th Cir.2005).  ICE is a federal agency, not a person who acts under color of state law.  <u>See</u>, <u>Payne v. Secretary of Treasury</u>, 73 Fed. Appx. 836, 837 (6th Cir. 2003) (no viable Section 1983 claim against head of federal agency because she acts under color of federal law).

Likewise, the Due Process Clause proscribes conduct by the state, not the federal government. It provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of a citizen, nor shall any State deprive any person of life, liberty, or property , without due process of law[.]" <u>See</u>, <u>Shell v. United States Dept. of Hous. & Urban Dev.</u>, 355 Fed. Appx. 300, 307 (11th Cir. 2009) (plaintiff "cannot show that the . . .  defendants violated the Fourteenth Amendment, because that amendment applies only to state action, and the defendants are a federal agency and a federal employee").

Plaintiffs' <u>Bivens</u> claim fares no better.  In <u>Bivens</u>, the Supreme Court held that an individual harmed by a federal agent's violation of the constitution may bring an action for damages against the agent.  403 U.S. at 397.  Since then, the Supreme Court has "'responded cautiously to suggestions that <u>Bivens</u> be extended into new contexts," and held that "[a]n extenstion of <u>Bivens</u> to agencies of the Federal Government is not supported by the logic of <u>Bivens</u> itself." <u>FDIC v. Meyer</u>, 510 U.S. 471, 486 (1994); <u>see</u>, <u>Salt Lick Bancorp. v. Fed. Deposit Ins. Co.</u>, 187 Fed. Appx. 428, 435 (6th Cir. 2009) ("a <u>Bivens</u> claim may not be brought against a federal agency").

To be sure, "[t]he Due Process Clause of the Fourteenth Amendment . . . imposes the same

16

restraints on the states that the corresponding clause of the Fifth Amendment imposes on the national government," Inmates of Orient Corr. Inst., 929 F.2d 233, 235 (6th Cir. 1991), and, therefore, "[a] Federal agency may not, consistently with the Fifth Amendment Due Process Clause, do that which a State is forbidden to do by the Fourteenth Amendment Due Process Clause." Stone v. FDIC, 179 F.3d 1368, 1374 n.2 (Fed. Cir. 1999). It would exalt form over substance not to consider Count III as having been brought under the Fifth Amendment because Plaintiffs' specifically allege that ICE's actions in entering into the MOA violated their due process rights. See, Consejo de Desarrollo Economico de Mexicali, A.C. v. United States, 482 F.3d 1157, 1170 n.4 (9th Cir. 2007) (reading an Equal Protection Clause claim as arising under the Fifth Amendment since it was brought against the Bureau of Reclamation, a federal agency). Even so, the Court does not see how ICE – as opposed to perhaps DCSO employees or ICE supervisors – violated Renteria's due process rights as alleged in the Complaint.

The physical actions which constitute the alleged due process violations, to wit, subjecting Renteria to custodial interrogation, imprisoning him without probable cause based on a detainer, failing to give him notice and an opportunity to be heard regarding the detainer, and seizing his identification card are all actions specifically alleged to have been taken by Metro personnel, not ICE, the agency. ICE's sole culpability was entering into the MOA allegedly in violation of a city charter; however, "[m]ere violation of a state statute does not infringe the federal constitution," Snowden v. Hughes, 321 U.S. 1, 11 (1994), and, in order to establish the deprivation of either procedural or substantive due process, a plaintiff must show an intent more culpable than mere negligence. See, Mitchell v. McNeil, 487 F.3d 374, 377 (6th Cir. 2007) (substantive due process); Wantanabe Realty Corp. v. City of New York, 159 Fed. Appx. 235, 237 (2nd Cir. 2005) (procedural due process).

Perhaps recognizing as much, Plaintiffs allege in their Complaint that Rentieria's

imprisonment was the result of "custom, policy, and/or practice of deliberate indifference of the DCSO and ICE supervisors charged with administering the 287(g) Agreement on the part of ICE." (Docket No. 45 at 25 ¶ 166). However, "[t]he deliberate indifference standard is a 'stringent standard of fault, requiring proof that a[n] . . . actor disregarded a known or obvious consequence of his action'" and "there must be a 'direct causal link between the . . . policy or custom and the alleged constitutional deprivation.'" Beard v. Whitmore Lake School Dist., 244 Fed. Appx. 607, 611 (6th Cir. 2007) (citations omitted).

In response to ICE's Motion to Dismiss, Plaintiffs do not explain the causal link or indeed the policy, practice and custom that they claim led to the alleged deprivation of Renteria's rights. Plaintiffs merely argue that "the MOA signed by ICE and Metro Government constitutes a final agency action which caused Renteria's injuries[.]" (Docket No. 59 at 20). Yet the only agency action identified in this case is the entry into a 287(g) agreement which may or may not have violated the Charter. There is no suggestion that 287(g) agreements are facially unconstitutional, or that ICE has knowingly entered into other 287(g) Agreements that are alleged to violate a local law. All that is alleged against ICE (as opposed to "ICE supervisors" who are not Defendants in this case) is that ICE should not have entered into such an agreement with Metro because of the Charter. Plaintiff simply has not alleged how this amounts to deliberate indifference and/or identified a custom, policy or practice by ICE which directly led to the deprivation of Renteria's constitutional rights. Cf. Bd. of County Comm'rs of Bryn County v. Brown, 520 U.S. 397, 403 (1997) (internal citations omitted) ("we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury. . . Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body"); Perez v. Oakland County, 466 F.3d 416, 430 (6th Cir. 2006) (citation

omitted) ("Deliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liability").[7] Accordingly, Plaintiffs' due process claims, as set forth in Count III, will be dismissed as to ICE.


## B. Remaining Motions and Decision to Certify Question to Tennessee Supreme Court

As has already been noted, a portion of ICE's Motion to Dismiss Count II rests upon its contention that the MOA does not violate the Charter. The question of whether the MOA violates the Charter is also pivotal to the remaining motions. Most importantly, that question is the very centerpiece of this lawsuit and may prove to be dispositive of the litigation. Under the particular circumstances of this case, the Court will certify to the Tennessee Supreme Court the question of whether the 287(g) agreement violates the Charter. With that conclusion, the Court will deny the remaining Motions pending an answer to the certified question, or an indication by the Tennessee Supreme Court that it declines to answer the question.

The decision of whether to certify a question to a state supreme court "rests in the sound discretion of the federal court," Lehman Bros. v. Shein, 416 U.S. 386, 391 (1974), and it is a decision which may be made *sua sponte* by the court. Elkins v. Moreno, 435 U.S. 647, 662 (1978). While a matter of discretion, it is not a decision undertaken lightly by this Court.

On the one hand, federal courts often answer state law questions, just as state courts answer

---

[7] Even though Brown and Perez involved Fourteenth Amendment claims against municipalities under Section 1983, the quoted language is useful by analogy because the Supreme Court in Iqbal held that "the federal analog" to Section 1983 claims is a Bivens suit and, thus, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 129 S.Ct. at 1948.

federal questions. Thus, the practice of certifying questions can be overused and add unnecessary burden on the answering court, particularly when the certification involves routine, run-of-the mill legal questions. See, Seals v. H & F, Inc., 301 S.W.3d 237, 241 n.3 (Tenn. 2010) (noting that the Tennessee Supreme Court does "not share[] . . . the harsh assessment of the general merits of the certification process" espoused by some commentators, but also observing "certifying a question is not always the best option").

On the other hand, certification eliminates guesswork and speculation about questions of state law, and "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." Arizonans for Official English v. Arizona, 520 U.S. 43, 79 (1997); Shein, 416 U.S. at 386 (by certifying a question of state law, the federal court may save "time, energy and resources and hel[p] build a cooperative judicial federalism"). It also serves the salutary function of "protect[ing] states' sovereignty," something which "'is no small matter, especially since a federal court's error may perpetuate itself in state courts until the state's highest court corrects it.'" Haley v. Univ. of Tennessee-Knoxville, 188 S.W.3d 518, 521 (Tenn. 2006) (citation omitted).

Recognizing that the process should be used sparingly, the Court finds that certification of the state law question is appropriate in this case. The answer to the question will determine whether correctional officers in Nashville and Davidson County are lawfully performing immigration enforcement duties. It will also answer the question of whether many local citizens who enter the jail system are subjected to unlawful investigations. Additional, since the very beginning of this case, Plaintiffs have desired an answer from the Tennessee state courts as to whether the 287(g) Agreement violates the Charter, and a decision on the certified question by the Tennessee Supreme Court will provide the definitive answer to this important question.

Under Tennessee law,

> The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee.

Tenn. Sup. Ct. R. 23 § 1. In accordance with Tennessee Supreme Court Rule 23, the Court finds that (1) the issue of whether the MOA violates the Charter will, one way or the other, effectively determine the outcome of this case, and (2) there does not appear to be a Tennessee Supreme Court decision which is directly controlling.

First, each of the causes of action brought by Plaintiffs' have as their genesis the alleged illegality of the MOA under the Charter. Counts I directly alleges that the MOA gives employees of the DCSO powers which exceed those allowed under the Charter, Count II alleges a violation of the APA precisely because the 287(g) Agreement violates the Charter, and Count III alleges due process violations because of the 287(g) Agreement. Even Count IV, which alleges that Renteria was falsely imprisoned for "nearly twelve hours without any legal authority," is grounded on the claim that said imprisonment was "a direct result of the DCSO's 287(g) Program." (Docket Entry No. 45 at 16 & 24 ¶¶ 102 & 169). Plaintiffs' request for declaratory and injunctive relief also hinges upon the validity of the 287(g) Agreement under the Charter. (Id. at 24-26 §§ (a) & (b)).

Second, there does not appear to be any controlling precedent from the Tennessee Supreme Court that addresses the question of whether DCSO officers performing immigration duties under a 287(g) Agreement violate the Charter, although decision discussed the Charter in relation to the DCSO and the Nashville Police Department. In Poe, the Court was presented with several different issues regarding the Charter, including: "Are the criminal law enforcement powers and authority in

the area of the Metropolitan Government vested in the Metropolitan Chief of Police exclusively?"

Poe, 383 S.W.2d at 267.  Looking to the Charter, the Court observed that Section 16.06 dealt "with the functions of constitutional and county officers," by providing:

> The Sheriff, elected as provided by the Constitution of Tennessee, is hereby recognized as an officer of the Metropolitan Government.  He shall have such duties as are prescribed by T.C.A. 8–810 or by other provisions of the general law, except that within the area of the Metropolitan Government the Sheriff shall not be the principal conservator of the peace. The function as principal conservator of the peace is hereby transferred and assigned to the Metropolitan Chief of Police as set out in Article 8, Chapter 2 of this Charter.

Id. at 273.  Ultimately, the Tennessee Supreme Court held that, in light of the language of the Charter, "[i]t is plain to us that it is the purpose and intent of the Charter to take away from the Sheriff the responsibility for the preservation of the public peace, prevention and detection of crime, apprehension of criminals, protection of personal and property rights except insofar as may be necessary and incidental to his general duties as outlined in T.C.A. § 8–810 and to transfer such duties to the Department of Police of the Metropolitan Government."  Id. at 275.

Tellingly, the Poe decision was penned half a century ago.  In its opinion, the Tennessee Supreme Court recognized that times and circumstances change:

> Any language employed by us over and above that necessary and proper to dispose of the issues presented as aforesaid is not binding on future decisions of this Court.

> It is a familiar law that a decision is authority for the point or points decided, and nothing more, and that general expressions in an opinion are to be taken in connection with the case in which they were used, and when they go beyond that, they are not authority for another case.

> *               *               *

> The Court in construing the Charter provisions of the Metropolitan Government of Nashville and Davidson County has always considered the stated purpose of the Amendment, that is, to consolidate functions of the two former governments so as to eliminate duplication and overlapping of duties and services by which economic savings to taxpayers will be realized.

22

It is our duty to observe the doctrine of stare decisis as one of commanding importance giving as it does firmness and stability to principles of law evidenced by judicial decisions. The Court, however, should not close its doors to the changing conditions, but should so fashion its opinions that the new truly grows out of the old as the product of a changing environment.

We have and do keep this thought in mind in passing upon matters that have and may be presented to us in regard to this new concept of metropolitan government, looking for precedents where they may be found to guide us, and where there are none, we undertake to apply logic and reason in resolving the complex situations which have been herein and heretofore presented to us.

Poe, 383 S.W.2d at 277 (internal citations omitted).

Having decided to certify the question of the legality of the 287(g) Agreement under the Charter, the Court will call upon the parties to formulate the precise facts which serve as the basis for the claim that the 287(g) Agreement either does, or does not ,violate the Charter. This should not be too difficult a task since the MOA contains a listing of the immigration enforcement duties, Plaintiffs have identified those duties in his Complaint, and no arguments thusfar have been raised about the actual duties contemplated by the Agreement.

The parties should seek to arrive at a stipulation which includes a *complete* list of the duties performed by DCSO personnel under the Agreement. It is only fair that, if the Tennessee Supreme Court decides to take the time and effort to answer the certified question, it have before it a concise but complete set of facts. See, Shorts v. Bartholomew, 278 S.W.3d 268, 271 n.1 (Tenn. 2009) (noting that because it did not have the record and "federal district court did not certify the facts," Tennessee Supreme Court was required to look to prior orders entered by the federal courts in order to determine the facts). Moreover, the Court does not want to be presented with a situation wherein the Tennessee Supreme Court answers the question, only to have a party or parties call the answer into question by claiming that some other unlisted duties were not considered.

### III.  CONCLUSION

On the basis of the foregoing, ICE's Motion to Dismiss Count II will be denied at this time, but the Motion will be granted as to Plaintiffs' due process claim against ICE as set forth in Count III.  Plaintiffs' Motion for Partial Summary Judgment as to Counts I and II will be denied.  With that ruling, Metro's Motions to Hold Plaintiffs' Motion for Partial Summary Judgment in Abeyance and its alternative Motion to Open Case for Necessary Discovery will be denied as moot.

Finally, the Court will certify to the Tennessee Supreme Court the question of whether the 287(g) Agreement between ICE and Metro violates the Charter.  The parties will be required to meet in person and confer in an effort to arrive at a complete stipulation as to the duties that DCSO personnel perform under the 287(g) Agreement.

An appropriate Order will be entered.

_Kevin H. Sharp_
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE